(No. 5667.   July 3, 1931.)

MRS. CARRIE CROY, Claimant and Respondent, v. Mc-FARLAND–BROWN LUMBER COMPANY, Employer, and AETNA CASUALTY & SURETY COMPANY, Surety, Appellants.

[1 Pac. (2d) 189.]

Harry M. Morey and R. M. Cummins, for Appellants.

Myrvin Davis, for Respondent, cites no authorities on points decided.

GIVENS, J.—This appeal is from a judgment of the district court awarding compensation, reversing an order of the Industrial Accident Board, denying compensation.

The material testimony was as follows:

Mrs. Croy stated her husband (the employee for whose death compensation is sought) was as a rule always healthy, and had not had any trouble she knew of; about a week before Christmas (December 15, 1928) he came home in an automobile from work in the woods, walked into the house, said he had "had that spell," and complained about his head being "woozy," and hurting him; he went to the hospital; no doctor was there, and the nurse gave him some pills and a bottle of medicine, told him to go home and to bed, which he did, and she (his wife) rubbed him with liniment, which did him more good than medicine. He stayed home a week sitting up, and then returned to work (December 31, 1928); that his head still felt "woozy," otherwise he felt good.

Mike Doyle said he was working with Mr. Croy in December; going to work they each carried a crowbar, pick, chopping axe, and lunch, all weighing about forty pounds, and right after breakfast had walked up a steep road about twenty per cent, for three-quarters of a mile, when they stopped to rest; the witness saw Mr. Croy fall headlong under a pile of poles by the road side; that is into a little bit of a dip between the skids (under the poles); a little depression under the poles into quite a little snow · (the poles did not fall on Mr. Croy); that Mr. Croy was unconscious and had a little bruise on his nose, and a little blood on his nose which did not amount to much (in his oral argument, counsel for claimant did not contend the striking of the nose, if it did strike the poles, was an, or the, accident which would authorize compensation); several came up, and all worked about three-quarters of an hour on Mr. Croy, when he gasped a little, and finally regained consciousness; he was picked up and taken in a dray or little low sled, to the foot of the hill and then in an automobile to his home.

Another of Mr. Croy's fellow workmen, F. N. LeFeur, testified that the morning Mr. Croy died (January 12, 1929), after breakfast about 6:30, they went up a pretty steep road (the same traveled by Croy and Doyle), over

which logs and supplies were hauled, and traveled by some automobiles; and on arriving at their destination, before starting to saw, took off their coats, about twenty to forty feet apart, when the witness saw Mr. Croy fall, making a noise something like a gasp. The witness quickly went to Croy, and tried to help him; worked his arms and legs and rubbed the back of his neck. Mr. Croy did not give very much sign of life, only once opened his eyes a little bit; the witness asked him if he was getting better; his eyes went shut and he did not open them any more; at witness' call, help came, but Mr. Croy never regained consciousness at all.

Dr. Stackhouse, the only physician called, testified for the claimant (the appellants introduced no evidence) as follows:

"Q. Then, doctor, if the evidence should show in this case that Otis Croy was a man about six feet tall and weighing about 200 pounds, engaged in woods work, and after eating breakfast about half an hour later walked about ¾ of a mile up quite a steep road and stopped to rest, putting their burdens down and . . . . that he was standing facing a pile of poles that were about three to four feet high and that the poles were placed up on skids and that there was a pit or depression in the ground under the side of the poles at the point where Mr. Croy fell, that in falling he made a sound sufficient to attract the fellow worker that was standing some few feet from him, and when this fellow worker turned he saw that Mr. Croy had fallen and that his head and shoulders were underneath the poles, this pile of poles, that he was lying on his face and that his nose had been struck against something and had caused an abrasion which bled, on about the bridge of his nose . . . . (omitting remarks of counsel) and from that accident remained unconscious for about 45 minutes and was taken to his home, being assisted to a car, and upon reaching home after a ride of about 20 miles, walked into the house by himself, stayed at home for about two weeks, had pains in his head, and his head felt during that time,—it was described as 'woozy'—then returned to

work and worked about nine days at labor that is not disclosed, and on the morning of the 10th after climbing a steep road about half a mile again fell over and did not recover consciousness and died,—could the first accident be considered the probable cause of his death, and, if so, tell us for what technical reasons? . . . . (Objections and rulings omitted.)

"A. As I see the question, letting out the question of the actual contact, probability of the contact, of the pole with his person—is that it?

"Q. Yes.

"A. An injury of that kind might be sufficient to cause a temporary unconsciousness. There might be several pathological conditions develop. There might be a condition in which, a condition of the brain, in which event there would be a temporary loss of consciousness. With the description, or a condition that you have described, the regaining of consciousness, a 'woozy' condition, for a period of time and the later regaining of sufficient strength to attempt to resume his occupation, it appears to me that that might be possible. . . . . (Objection and ruling omitted.)

"A. A second condition that might develop from such an injury might be the blow, with the contusion, with a loss of a certain amount of blood, a small amount of blood, I will say with a varying amount of blood, it might be small or moderate,—with that condition there might be temporary restoration of consciousness with mental confusion and an ability, after a period of time, after a certain amount of absorption had taken place, and ability to resume his occupation to a limited degree, depending on the amount of absorption of the clot or exudate that had developed as a result of an injury.

"Q. Now, the question, as I framed it, I believe, doctor, contemplates your giving as your opinion as to the connection between this first accident and the death of the employee, Mr. Croy?

"A. In the second event that I have mentioned it would be possible for a small amount of blood in the form of an embolus to be dislodged and entering the circulation pro-

duce sudden death. . . . . (Question, objection and ruling omitted.)

"Q. Yes, my mind is not entirely clear on the effect of your answer. You understand, do you, from my question that Mr. Croy died on or about the 12th of January, that this first accident when he fell under the poles occurred about a week before Christmas or something like that?

"A. As I understand it, figuring up the time that you expressed here, I figured 25 days.

"Q. Something like that would be right. Yes. You may cross-examine."

(Cross-examination by Mr. Morey.)

"Q. All that you have said, doctor, is that there is a possibility?

"A. That is all."

The board found as follows:

"That on December fifteenth, 1928, the said Otis Croy, now deceased, ate his breakfast at about six-thirty, A. M., and at about seven o'clock A. M., the said Otis Croy with a fellow workman proceeded from the camp for a distance of about three quarters of a mile to the place where they were to saw logs; that the said Otis Croy and his co-worker each had a crowbar, a pick, and chopping axe, and a lunch pail; that the weight of said crowbar, pick and chopping axe was about forty pounds; that they proceeded along the usually traveled road and up a grade of about twenty per cent., and stopped on the road to rest; that they stuck their picks in some poles which were piled near the roadway and set their lunch buckets down and were standing in the road resting; that while the fellow workman was standing near the said Croy, Croy fell to the ground unconscious with his head and part of his shoulders underneath the poles which were piled on skids near the road; that the fellow workman immediately resorted to first aid measures to revive his companion, and later a dray was brought and Croy was taken down to the foot of the hill; that Croy later revived and returned to his home in Sandpoint, Idaho, complaining of his head hurting; that he went to see a doctor, and, the doctor being absent, a nurse gave him some

pills and a small bottle of medicine; that the deceased's wife rubbed him with liniment; that he remained home for a week, and on the day prior to New Years returned to the camp of the McFarland-Brown Company and resumed his work.

"That on January twelfth, 1929, Otis Croy, now deceased, had his breakfast at about six-thirty, A. M., and at about seven o'clock A. M., with a fellow workman proceeded to a point about one-half mile from the camp and along a steep road where they were to engage in sawing logs for a dam; that after arriving at the place where the work was to be performed and before Croy had commenced his work, the fellow workman removed his coat and was about twenty or thirty feet from Croy when he heard Croy fall, and turned and found him lying on the ground; that he endeavored to revive Croy but was unable to do so, and that the said Croy, at the said time and place died."
and made the following ruling of law:

"The death of Otis Croy on January twelfth, 1929, was not the result of a personal injury by accident arising out of and in the course of his employment with the McFarland-Brown Lumber Company."

The Court found the facts to be substantially the same, with this additional finding:

"That the said Croy died approximately three weeks after his first collapse, after having been unable to work from the 15th of December 1928 until December 31st or January 1st, 1929, and having suffered during all that time from the accident sustained by him on the 15th day of December 1928. That upon resuming work and about three weeks after his first injury, he again climbed the same hill carrying a heavy burden, and that after climbing the said hill for a distance of about three-quarters of a mile, he collapsed and died. That the said second collapse was caused by an accident incurred during his employment, and that his death was the direct result of the strain caused in climbing the said hill with a heavy load upon his back, in the course of his employment."
and concluded:

"That the death of Otis Croy on January 12, 1929, was the result of a personal injury by accident arising out of and in the course of his employment with the McFarland-Brown Company."

█ The burden of proof was on respondent to prove that the deceased suffered an accident arising out of, and in the course of his employment. (*Walker v. Hyde,* 43 Ida. 625, 253 Pac. 1104; *Hawkins v. Bonner County,* 46 Ida. 739, 271 Pac. 327; *Larson v. Ohio Match Co.,* 49 Ida. 511, 289 Pac. 992.)

█ If there is competent evidence to support the board's findings, such findings will not be disturbed. (*Ybaibarriaga v. Farmer,* 39 Ida. 361, 228 Pac. 227.)

█ While an accident may be slight and the untoward circumstance meager, there must be some distinctive unexpected happening; for instance as in *Larson v. Blackwell Lumber Co.,* 48 Ida. 136, 279 Pac. 1087:

" 'Now this man lifted, and *probably* at that time tore a weak point in a diseased aorta, produced a dissecting aneurism, which later broke into the pericardial sac, of which that is a tab . . . . '

"When asked if exertion would not accelerate the aneurism more than normal activity, the witness answered in the affirmative. He further testified:

" 'And the pain at that time was *probably* due to the fact that the dissecting aneurism dissected a little farther at that time. Because when he lifted he complained of a stinging pain in the upper part of his chest, which ran upward. We know that to be a typical aortic pain, and the pain occurred when the blood dissected the two walls more, that is, the stinging pain.' " (Italics ours.)

█ There must be a probable, and not a possible, connection between the cause and the effect. (*Hawkins v. Bonner County, supra; Larson v. Ohio Match Co., supra.*)

Herein, no cause of an accidental nature was shown, nor any probable result from what did happen, i. e., walking up the steep hill, or falling.

In *Larson v. Blackwell Lumber Co., supra,* there was evidence that at the instant of unusual strain in lifting or

holding a block, "the dissection of the wall of the aorta spread further than it had been," resulting in the condition which caused death. There was no such showing herein.

In *Butler v. Anaconda Copper Min. Co.*, 46 Ida. 326, 268 Pac. 6, the evidence showed that lifting a wagon box caused a rupture of the innominate artery and that death was attributed to the rupture and the unusual exertion.

No cumulative effect as shown in *Aldrich v. Dole*, 43 Ida. 30, 249 Pac. 87, was disclosed herein.

As stated above, claimant places no reliance on the injury to deceased's nose; therefore the analysis of the evidence in *Twitchell v. Beardmore*, 50 Ida. 147, 295 Pac. 428, is closely in point, and amply authorized the board's conclusions herein.

▆ There was such lack of evidence to prove that an accident occurred, or causal connection, that the board was justified in refusing an award, and the Court erred in setting aside the board's findings and conclusions. (*Reader v. Milwaukee Lumber Co.*, 47 Ida. 380, 275 Pac. 1114.)

Judgment reversed.

Lee, C. J., and Budge, Varian and McNaughton, JJ., concur.