(No. 6027.   December 9, 1933.)

PERLEY E. LARSON, Administrator of the Estate of LIZZIE HAGEN, Deceased, Employee, Appellant, v. CALLAHAN CANNING COMPANY OF COEUR D'ALENE, IDAHO, Also Known as COEUR D'ALENE CANNING COMPANY, Also Known as IDAHO PACKING COMPANY, Employer, and COLUMBIA CASUALTY COMPANY, Surety, Respondents.

[27 Pac. (2d) 967.]

Edward H. Berg, for Appellant.

J. Ward Arney and H. Earl Davis, for Respondents.

WERNETTE, J.—Decedent, Lizzie Hagen, was in the employ of the respondent, Callahan Canning Company, at Coeur d'Alene, Idaho. Her duties required her to work near a revolving shaft. She was injured November 19, 1928, when her hair caught in such shaft, resulting in pulling out a strip of hair from about the base of the skull to near the forehead, an inch and a half to two inches wide. After working for a very short period of time on the same day, after the injury, she was taken home where she was confined to bed and home for a period of about eight days, when she again returned to work for the same company, but was assigned to other duties and at a different place in the building from that at which she was injured. She worked until December 7th, when the plant of the company closed. After that, deceased, Lizzie Hagen, did not go back to work, she did, however, perform her housework for a period of approximately two years from the date of the injury, there being some conflict in the evidence as to the length of time she continued to do her housework and the extent thereof. The evidence makes it certain that from the date of the injury deceased gradually lost her strength, and her general health condition apparently was gradually breaking down, she having enjoyed good health up to the date of the injury.

About two years after the injury, for the first time, numbness of the right hand was discovered, so that she was unable to hold a sewing needle, and late in the year of 1931 tremors of the hand and arm became apparent, which condition,

shortly afterward, extended to the other arm and to the legs, and a certain degree of rigidity of the members affected also appeared, which condition ultimately progressed to total disability and death.

In August, 1931, deceased went to the hospital suffering with a badly lacerated and eroded cervix and injury of the perineum, due to childbirth, her last child having been born thirteen years previous. The cervix was amputated and the perineum repaired; deceased remaining in the hospital from August 10th to the 27th. At that time she was very weak and anemic. Her attending physician, Doctor Seaburg, though making a careful examination, did not observe any paralysis, tremors or rigidity. Shortly after the operation her anemic condition improved materially. Her weakened condition did not improve but became worse, and it was shortly after that the tremors, paralysis and rigidity first made definite appearance, which condition gradually grew worse until death.

Her death took place after the hearing before the Industrial Accident Board, her son, Perley E. Larson, being appointed administrator of her estate and substituted as party plaintiff and appellant.

Five doctors testified before the board, four of whom testified on behalf of appellant and one on behalf of respondent. All five doctors were agreed that the condition of deceased was due to a disease commonly known as *paralysis agitans,* and all five doctors were in accord that the exact cause of the disease is, as yet, unknown to the medical profession; that it is an involvement of the central nervous system and that the midbrain is the seat of degenerative changes, which generally occur after years of slow and progressive deterioration, which ultimately brings about the condition known as *paralysis agitans.* It is also claimed by doctors and leading authorities that shock, fright, trauma, injuries, infections and syphilis precipitate or aggravate the condition, or are exciting causes of *paralysis agitans.*

All four doctors testifying on behalf of the claimant stated that it was their opinion, respectively, that the injury

received by Lizzie Hagen on November 19, 1928, was the "exciting cause" of the *paralysis agitans* with which she was afflicted and which caused her death; giving their specific reasons for their opinion that the disease manifests itself by progressive weakness, tremors, paralysis and more or less rigidity, all of which conditions became pronounced, in order, after deceased sustained the injury complained of.

Doctor Lewis, testifying on behalf of respondents, who had examined the deceased thoroughly, prior to the hearing before the board, was as positive that the injury in no way contributed, or in any manner caused the *paralysis agitans* with which deceased was afflicted, contending that if the injury had been the exciting cause of the affliction, the tremors, paralysis and rigidity would have appeared very shortly after the injury, at least within a period of a very few weeks and under no conditions beyond a period of one year from the date of the injury; that deceased did not receive a severe brain injury. The record disclosing that the hair was merely pulled out by the roots and that deceased was not thrown against the shaft, nor did she fall; that all of the hair that was pulled out grew in again, indicating that there was no severe scalp injury; that she worked for a short period of time after the injury on the same day, and was able to work again eight days thereafter. Dr. Lewis testified, "that it could not have been caused by the accident itself because there was no brain damage done; in other words, had there been any definite damage to the brain the symptoms of *paralysis agitans* would have come on immediately." Doctor Lewis was also of the opinion that the deceased was suffering from *phlebitis*, in that her right leg was larger on all of the planes and diameters throughout, being a condition following a history of childbirth, whereby the leg remains larger than the other leg throughout life. It was also his opinion that *encephalitis* is one of the principal causes of *paralysis agitans*, and that the deceased had definite symptoms of *encephalitis*, being increasing weakness and failing vision; that both *encephalitis* and *phlebitis* were probable exciting causes of the *paralysis agitans* of which

deceased was suffering. In these major contentions made by Doctor Lewis the physicians testifying for appellant were not in accord, thereby creating a direct conflict in the evidence.

The board in its findings found as follows:

"That the deceased Lizzie Hagen's disability for work was due to a disease known as paralysis agitans; that said disease was not the result of the injury by accident sustained by the said Lizzie Hagen, now deceased, on the 19th day of November, 1928, while in the employ of the defendant, Callahan Canning Company, nor the result of any injury by accident arising out of and in the course of her employment with the defendant, Callahan Canning Company."

The board refused to award compensation, all of which was affirmed by order and judgment of the district court, from which order and judgment of the district court this appeal has been perfected.

Appellant specifies several assignments of error. There is but one real question involved which is decisive of this case. Was there a substantial conflict in the evidence, and does the evidence support the findings of the board?

As heretofore pointed out, there is a substantial and direct conflict in the evidence as to what was the exciting cause of the *paralysis agitans* with which deceased was afflicted. Appellant's medical testimony all being to the effect that the exciting cause was due to the injury sustained by the deceased, while the medical testimony of respondent was just to the contrary, and there is ample evidence in the record supporting the findings, conclusion and award made by the board and affirmed by the district court, to the effect that the injury was in no way the exciting cause of the *paralysis agitans* of which deceased was afflicted.

Section 43-1408, Idaho Code Annotated, provides as follows:

"An award of the board in the absence of fraud, shall be final and conclusive between the parties, except as provided in section 43-1407, unless within thirty days after a

copy has been sent to the parties, either party appeals to the district court. *On such appeal the jurisdiction of said court shall be limited to a review of questions of law.*

"All appeals of matters arising under the workmen's compensation law shall, by the court to which taken, be disposed of before any civil causes or actions are considered."

And we quote from the case of *McNeil v. Panhandle Lumber Co.*, 34 Ida. 773, 203 Pac. 1068, 1071, as follows:

"The well settled rule that forbids this court to reverse a trial court in cases in which the evidence is conflicting but sufficient to sustain a decision applies to the findings of fact made by the industrial accident board in cases of this kind, and is applicable likewise to the district court in reviewing the decisions of said board, the jurisdiction of said courts in such cases being limited to a review of questions of law."

In the case of *Ybaibarriaga v. Farmer*, 39 Ida. 361, 228 Pac. 227, 229, we find the following language:

"In cases where the evidence is conflicting, the findings of the board are binding upon the court and cannot be disturbed by it, provided there is competent evidence to support them."

And in the case of *Croy v. McFarland-Brown Lumber Co.*, 51 Ida. 32, 1 Pac. (2d) 189, the court held:

"If there is competent evidence to support the board's findings, such findings will not be disturbed."

See, also, *Reader v. Milwaukee Lumber Co.*, 47 Ida. 380, 275 Pac. 1114.

Judgment affirmed, without costs.

Budge, C. J., and Givens, J., concur.

Holden, J., concurs in the conclusion reached.

MORGAN, J., Dissenting.—The decision in the foregoing opinion is based on the theory that there is a conflict in the evidence and on I. C. A., sec. 43–1408, therein quoted. The portion of that section which attempts to limit courts to a

review of questions of law violates Idaho Constitution, art. 1, sec. 18, art. 2, and art. 5, sec. 13, and, if the legislature in enacting the Workmen's Compensation Law attempted to create a court, it also violates art. 5, sec. 2. These sections are as follows:

Art. 1, sec. 18: "Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice."

Art. 2. "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

Art. 5, sec. 13: "The legislature shall have no power to deprive the judicial department of any power or jurisdiction which rightly pertains to it as a co-ordinate department of the government; but the legislature shall provide a proper system of appeals, and regulate by law, when necessary, the methods of proceeding in the exercise of their powers of all the courts below the Supreme Court, so far as the same may be done without conflict with this constitution."

Art. 5, sec. 2: "The judicial power of the state shall be vested in a court for the trial of impeachments, a Supreme Court, district courts, probate courts, courts of justices of the peace, and such other courts inferior to the Supreme Court as may be established by law for any incorporated city or town."

It is true, as pointed out in the foregoing opinion, this court has repeatedly held that "in cases where the evidence is conflicting, the findings of the board are binding upon the court and cannot be disturbed by it, provided there is substantial evidence to support them." It is also true that the courts of some other states, having constitutions apparently intended to prohibit the confusion of powers among the departments of government, have decided this question

the same way. However, an error oft repeated is none the less erroneous. The language of our constitution is incapable of any interpretation which will justify depriving the courts of power to glean ultimate facts from disputed testimony, or which will invest that power in an administrative board and make its findings conclusive upon the courts.

The plain provision of art. 5, sec. 2, vests the judicial power of the state in the courts created by the constitution, and prohibits making a court of the industrial accident board. Section 13 of that article expressly prohibits the legislature from depriving the judicial department of any power or jurisdiction which rightly pertains to it as a co-ordinate department of the government. Article 2 fixes the status of the judiciary as a co-ordinate department of government, and to put any other construction upon these provisions than their plain language implies, so as to hold that the legislature, by investing an administrative board with judicial power to determine finally, and to the exclusion of the courts, the facts of a case, is to close the courts of justice to the litigant and to deny him the benefits sought to be guaranteed by art. 1, sec. 18.

In *The Natatorium Co. v. Erb*, 34 Ida. 209, 200 Pac. 348, this court had under consideration the powers of an administrative board and its holding, on this point, is clearly reflected in sec. 6 of the syllabus, as follows:

"The Public Utilities Commission is an arm of the legislative authority and not a court of justice within the meaning of Const., art. 1, sec. 18."

If it is true, and it is, that an administrative board, such as is the industrial accident commission board, is "not a court of justice within the meaning of Const., art. 1, sec. 18," it cannot be said that the legislature, in granting exclusive jurisdiction to it to hear and determine the facts of a case, has not closed the doors of the courts to the persons whose rights are involved, in violation of that section.

In *Stein v. Morrison*, 9 Ida. 426, 75 Pac. 246, it is said:

"It is not out of place here to observe that the courts cannot disregard the provisions of the constitution and statutes, matter not what the character of the defense may be."

Also: "It seems to us that to keep within the spirit of our constitution (section 1, article 2) and form of government which recognizes the independence and specific character of the 'three distinct departments' of government, that the judicial department could not attempt to prohibit either of the other departments from *acting* within the recognized scope of their respective branches of the government, but that on the other hand the legal effect of such action after it has been taken may be inquired into by the court."

*Toncray v. Budge,* 14 Ida. 621, 95 Pac. 26, was a case wherein the eligibility of a citizen to hold office was called in question. The court said:

"Counsel for appellant argues with great earnestness and much force that it is without and beyond the power of the legislature to take from the duly organized, constitutional, judicial tribunal, the power and jurisdiction of determining a constitutional question; in other words, of determining a constitutional eligibility or ineligibility to hold an office. We would hesitate very much before disagreeing with counsel as to that proposition."

In that opinion the court quoted from *Commonwealth v. Jones,* 10 Bush (Ky.), 725, as follows:

"To admit that a contesting board may determine finally as to what constitutes a legal disqualification for office would be to decide that the legislature, instead of confining these tribunals to the discharge of executive duties, and to the determination primarily of mere questions of fact, had, in disregard of the distribution of the powers of government, existing by virtue of the first article of the constitution, created a high judicial tribunal—a court with power and authority to determine finally and conclusively questions of individual rights arising under the constitution—and provided that it should be composed exclusively of high executive officers.

"It is a matter of great difficulty to draw the exact line of demarcation between executive and judicial powers, and of still more difficulty to define with accuracy how far executive officers in the discharge of executive or ministerial duties, may bind the other departments of government by the exercise of *quasi-judicial* functions. But we regard it as an indisputable proposition that where the inquiry to be made involves questions of law as well as fact, where it affects a legal right, and where the decision may result in terminating or destroying that right, the powers to be exercised and the duties to be discharged are essentially judicial, and are such as cannot constitutionally be delegated to or imposed upon executive officers."

Our court further said:

"That court concluded by holding that an ascertainment and determination of the legal disqualification of a person to hold office 'is essentially judicial,' and that while the board might, in the first instance, pass upon it, that it would still be open to the courts for final consideration in case it became necessary to resort to the courts in order to carry out the order, determination or decision of the election board. (Dillon's Munic. Corp., 4th ed., sec. 201.) As touching the principle involved, see, also, *Cummings v. State of Missouri,* 4 Wall. 277, 18 L. ed. 356; *In re Garland,* 4 Wall, 333, 18 L. ed. 366."

In S*peer v. Stephenson,* 16 Ida. 707, 102 Pac. 365, the court, quoting from *Boise Irr. etc. Co. v. Stewart,* 10 Ida. 38, 77 Pac. 25, said:

"While the provisions of those sections authorize the state engineer to pass upon and decide certain questions and matters, in the first instance, they in no way conflict with the provisions of the said section of the constitution. If anyone is aggrieved by the decision of the state engineer, he has the right to appeal to the district court.

"So in hearing a contest, while the state engineer is authorized to pass upon and decide in the first instance whether the permit holder has complied with the law and the terms of the permit, such decision does not deprive any

party aggrieved of his right of action in a proper court. The statute does not attempt to make the action of the state engineer in any way bind or control the courts in determining the same matters.''

After reviewing a number of decisions the court said:

''Many other authorities might be cited which deal with the power exercised by an officer in the administration of his office, but we believe the true rule to be, that when a ministerial officer is called upon to decide and determine matters arising in the administration of his office, when such acts are not made final or binding upon the courts of the state, and full opportunity is given to any person aggrieved to have such matters adjudicated in the proper tribunals of the state, the acts of such officer are ministerial and not judicial.''

Applying this rule conversely, it follows that the legislature, by enacting in sec. 43-1408 that: ''on such appeal the jurisdiction of said court shall be limited to a review of questions of law,'' has sought to make findings of fact by the industrial accident board final and binding on the courts, allowing no opportunity to any person aggrieved to have the facts of the case adjudicated in the proper tribunals of the state, thereby seeking to make the acts of that ministerial board judicial, not ministerial, and that the above-quoted portion of that section is unconstitutional.

*Talbot v. Collins*, 33 Ida. 169, 191 Pac. 354, was a case wherein the court had under consideration an act of the legislature which attempted to fix the places where appeals to it would be heard. It was held that the act was an invasion of the constitutional powers of the court and void. Section 1 of the syllabus is as follows:

''Under the constitution of this state, the legislature may not prescribe the time or place of hearing and determining any cause pending on appeal in the supreme court.''

In that case the court overruled *Mahoney v. Elliott*, 8 Ida. 190, 67 Pac. 317, which held to the contrary.

In *Lyon v. City of Payette*, 38 Ida. 705. 224 Pac. 793, the court said:

"It is a judicial function to hear a cause pending between adverse parties, to apply the law to the facts, and to make and render a judgment determining the rights of the parties."

In *Re Edwards*, 45 Ida. 676, 266 Pac. 665, the court had under consideration an act of the legislature creating and granting powers to the board of commissioners of the Idaho State Bar. It said:

"That portion of sec. 8 which provides that 'The board of commissioners shall also have power to provide for the discipline of its officers and the members of its committee in the event of refusal, neglect, failure or corrupt or wrongful performance of their respective duties,' must be stricken from the act, as void, for the reason that it confers upon the board judicial powers."

In re *Speer*, *ante*, p. 293, 23 Pac. (2d) 239, the court said:

"Art. 2 of Idaho Constitution contains but one section. It divides the government of this state into three departments and undertakes to prohibit those belonging to one department from exercising powers belonging to either of the others."

In this case the findings and award by the industrial accident board are against the preponderance of the evidence. There is a conflict in the evidence only because of the testimony of Dr. D. H. Lewis, an expert witness, who, in the employ of respondents and for the purpose of preparing himself to testify in their behalf, examined Lizzie Hagen shortly before the hearing, and whose testimony is based on that examination and the history of the case, consisting of statements made by her in response to his questions. Dr. Lewis testified that, from his examination and from the history of the case, he came to the conclusion that Mrs. Hagen "had *paralysis agitans*, atypical in nature, which was not due to or had no connection with her accident."

While he agreed with the four physicians who testified on behalf of claimant as to the causes of *paralysis agitans*, as set forth in the foregoing opinion, Dr. Lewis testified that

*encephalitis* is the principal cause given by the authorities, and said: "I believe in practically every case of *paralysis agitans* I have seen, especially in the later years, there has been a history of, a definite history of *encephalitis,* and, furthermore, because we don't know much about *encephalitis* or sleeping sickness we have connected them up when we get that history." He further testified that he included *encephalitis* in the conclusion that it was not an injury which caused the disease in this case. Asked what symptoms of that disease Mrs. Hagen had, he said:

"A. She complained of weakness about two years after the accident and she also complained of her failing vision. Now, in *encephalitis* we do have failing vision. We have what they call double vision. They see two objects. I asked that question definitely and she didn't remember. Then the symptoms and the tremor came on afterwards.

"Q. Is tremor a symptom of *encephalitis?*

"A. Oh, no, I am talking about *paralysis agitans* now. The question was the symptoms of *encephalitis.*

"Q. Yes.

"A. Failing vision, diplopia, double vision.

"Q. Were those symptoms present?

"A. She gave that definite history of weakness and failing vision.

"Q. Would that be a sign of a probable approach of *paralysis agitans* in any case where a person has to wear glasses?

"A. Oh, no. I will admit to you at the age of 40 the vision generally begins to fade. It could be the natural cause. I am trying to find simply the cause for these symptoms and this *paralysis agitans,* and knowing that *encephalitis* is the probable cause of a large majority of cases, these symptoms were present and made me think of a probability that she may have had *encephalitis.*"

In his testimony as to the history of the case, Dr. Lewis gave the age of Lizzie Hagen as forty-eight years, and that her health was good prior to the accident. The testimony of other witnesses shows that before the accident she was a

strong, able-bodied woman, and that very shortly thereafter her health and strength began to fail, and continued to do so steadily and consistently until the examination made by him, yet, in his anxiety to account for her physical condition upon the theory that it was not brought about by accident, but by *encephalitis*, although there was no history of double vision, he found evidence of what he was searching for in her failing eyesight and failing strength.

The testimony of an expert witness is as weak and inefficient as is the foundation of fact on which it is based. In *Petajaniemi v. Washington Water Power Co.*, 22 Ida. 20, 124 Pac. 783, this court said:

"Now, it is true that a court is not expected to believe the testimony of a witness when it is in direct conflict with a well-recognized law of nature. The statute of this state (sec. 5950) (now I. C. A. 16–101) provides that 'courts take judicial notice of the following facts: . . . . No. 8. The laws of nature . . . . In all these cases the court may resort for its aid to appropriate books or documents of reference.' The courts will take judicial notice of the fact that water seeks its level, and if a witness should testify that it stood up in hillocks or piles like stone or earth, a court would not be expected to believe it. Or, if a witness should testify that a body when turned loose did not fall to the ground, but that it rather fell out into space, a court would not be expected to believe it, and such evidence would not be entitled to any weight or create a conflict of evidence. (*Hunter v. New York, O. & W. R. Co.*, 116 N. Y. 615, 23 N. E. 9, 6 L. R. A. 246; Elliott on Evidence, sec. 39; *Zimmerman v. Bannon*, 101 Wis. 407, 77 N. W. 735; *Peterson v. Standard Oil Co.*, 55 Or. 511, Ann. Cas. 1912A, 625, 106 Pac. 337; *Groth v. Thomann*, 110 Wis. 488, 86 N. W. 178; *In re Harriott's Estate*, 145 N. Y. 540, 40 N. E. 246.)"

All expert witnesses in this case testified that *paralysis agitans* may be caused by shock or fright as well as by physical injury. The undisputed evidence shows that, upon Mrs. Hagen's return to her place of employment after the accident, she wept when she came in sight of the cannery

and was so nervous she was unable to work in the room where she formerly was employed, and was given employment elsewhere; that after the few days she continued in the employ of the canning company she was never again able to perform gainful labor; that her hair turned white, and her strength steadily failed until the hearing, which occurred shortly before her death.

The statement in the foregoing opinion to the effect that Mrs. Hagen performed her housework "for a period of approximately two years from the date of the injury" has nothing more substantial for a basis than the testimony of Dr. Lewis as to the history of the case given him by her. He said:

"Patient was then taken to Dr. Dwyer's office, was given an opiate, some dressings. As far as she remembers, probably three dressings in all. Returned home after the first dressing and stayed in bed about one week and then returned to work. Worked a few days and stopped due to nervousness around the rolls. Was not unconscious very long, if at all. Remembers going to the doctor's office. Stated she has not worked since then. Movement of right arm and numbness of leg started about one year ago. Been bedridden the past year. Prior to that time was doing some housework."

Assuming, but not deciding, that a statement made to a physician and used by him as the basis for expert testimony is competent proof for all purposes, this statement does not sustain the assertion in the foregoing opinion that Mrs. Hagen performed her housework for approximately two years from the date of the injury. The testimony of her son and daughter, who resided with her, is to the effect that the mother was unable to do housework after the accident and that it was done by the daughter.

The evidence justifies the conclusion that *paralysis agitans* in this case was caused by shock and fright produced by the accident, and makes appropriate the following quotation from *Re Larson*, 48 Ida. 136, 279 Pac. 1087:

"We have reached the conclusion that there is no such conflict in the evidence as to warrant a holding that the findings of the board and the court must be upheld, and we are clearly satisfied that the great weight or preponderance of the evidence is against the findings and the decision, and that there is no substantial evidence to support them."