(No. 7179. November 2, 1944.)

DAVID R. CLARK, Employee, Appellant, v. GENERAL MILLS, INC., Employer, and THE TRAVELER'S INDEMNITY CO., Surety, Respondents.

(152 P. (2d) 895.)

A. A. Merrill and E. A. Owen, for appellant.

. Roy L. Black and John R. Black, for respondents.

BUDGE, J.—The board found, among other facts:

"IV

"That for some years prior to the 24th day of February, 1942, claimant was suffering from the effects of a toxic condition of his thyroid gland and during the month of August, 1941, at the request of his employer, was given a physical examination by a physician and surgeon, which examination revealed claimant had a exophthalmic goiter, and a degenerative condition of the heart muscles, varicose veins of both legs, marked tremors and increased reflexes. The claimant at that time was cautioned against over-exertion or strain and was told to 'slow up and take it easy'; that during the early part of January, 1942, claimant complained of pain in his arms and shoulders to his employer; that all of the conditions with which he was suffering at the time of the examination were of a progressive nature and because of claimant's advanced years would, if untreated, become worse.

## V

"That claimant continued to do his regular work for said employer until the said 24th day of February, and on the morning of said day, * * * claimant drove to the elevator at about the hour of 9:00 a. m., and went into the office, opened the till, looked around, and as he was about to pass through an inside door leading to the scale room, there was an explosion which injured the claimant and caused the burning of said place. :

## VI

"That the claimant testified the blast or explosion rendered him unconscious and probably knocked him through and out of the building, and further, that from the time of said explosion he was in an unconscious condition for several days; that shortly after the explosion mentioned above, claimant was seen staggering through the outside door of said elevator towards the roadway, shortly thereafter he was taken to his home and from there to a hospital in the city of Idaho Falls, at which time and place he was examined by a physician which disclosed the following: 'Claimant's face was cyanotic as well as the rest of his body; had difficulty in breathing; heart action extremely bad, pulse rapid and running, a general condition of anoxemia; shoulder swollen and discolored; back discolored and swollen; right chest severely contused;' that claimant was in an unconscious condition for only several hours after entering the hospital; that after regaining consciousness he complained of severe pain; that he was then given a heavy sedative and analgesic medication; hotpacks and diathermy treatments; that he remained in said hospital until the 2nd day of March, 1942, at which time he was permitted to return to his home. On March 15, 1942, because of claimant's physical condition he was again hospitalized and treated by the same physician until the 26th day of March, 1942; that said hospitalization and treatment were necessary by reason of the injuries received by claimant from said explosion. *Subsequently, and on the 20th day of June, 1942, claimant was again hospitalized for conditions not resulting from said injuries,* which at that time were described as nervousness and neuritis in his shoulders and back; that for the last mentioned conditions he received treatment and remained in the hospital until the 30th day

of June, 1942, when he was discharged from the hospital. (emphasis ours)

\* \* \* \*

IX

"That during the month of April, 1943, claimant was again hospitalized for a condition described as chronic myocarditis and endocarditis, *and which condition was not the result of or aggravated by the explosion of February 24, 1942;* that for this condition he remained in the hospital from April 8, 1943, to April 11, 1943, and was under treatment by the physician who first attended him. (emphasis ours.)

X

"That the explosion which occurred at said elevator on said 24th day of February, 1942, lighted up the symptoms of claimant's heart condition and toxic thyroid conditions from which he had been suffering for several years and bruised claimant's shoulder and back; that such lighted-up symptoms and bruised shoulder and back were the result of a personal injury caused by an accident arising out of and in the course of claimant's employment with the above named employer.

XI

"That by reason thereof, claimant was totally temporarily disabled for work from and including the 24th day of February, 1942, to and including the 26th day of March, 1942; that on said last mentioned date, the injuries caused by the explosion to the claimant's shoulder and back were healed and all the symptoms which had become lighted up had subsided; and that on said last mentioned date claimant was healed of all the results of said accident and injuries and all treatments received by him thereafter were on account of his diseased thyroid and heart condition and the unusual strain and suspense brought about by the jeopardy of the criminal charges against him, claimant having been charged with criminal offenses subsequent to the said 24th day of February, 1942.

XII

"That during the month of April, 1943, claimant was examined by a physician of the defendant, Traveler's In-

demnity Company, and at that time it was disclosed he was suffering from enlarged hyperplastic goiter, marked tremors, irregular heart action with some decompensation. He also had peri-arthritis and neuritis of the right shoulder and arm, all of which appeared to be of long standing; that because of these conditions which have been progressive for several years and because of his extreme nervousness, claimant has not been able to engage in any employment requiring physical exertion since the said 26th day of March, 1942; and that by reason thereof he is now totally disabled for work; *that said last mentioned disability for work is not the result of his injury by accident* received on the 24th day of February, 1942. (emphasis ours.)

\* \* \* \*

## RULINGS OF LAW

### I

"That claimant is entitled to an award against the defendants * * * for his total temporary disability for work from and including the 24th day of February, 1942, to and including the 26th day of March, 1942, * * *

### II

"That claimant is entitled to an additional award against the defendants * * * for reimbursement for hospitalization expenses incurred by him while hospitalized from the 24th day of February, 1942, to the 2nd day of March, 1942, and from the 15th day of March, 1942, to the 26th day of March, 1942, * * *"

The usual hospital expenses, doctors' fees, etc., were included in the amount recoverable by claimant against the defendants.

Whereupon the board entered an order in favor of claimant, as above indicated. This appeal is from said findings, rulings and award made and entered January 10, 1944.

Appellant relies upon seven assignments of error. We shall refer only to the errors assigned that are meritorious, namely, that the findings of the board were contrary to, and not supported by, the evidence adduced at the hearing.

Otherwise stated, the only question presented is whether or not there is sufficient competent evidence to support the findings and award.

It is well settled in this jurisdiction that on appeal from any order of the Industrial Accident Board this court shall be limited to a review of questions of law only. (Sec. 9, art. 5, Const., as amended, 1937 Sess. Laws, p. 498; *Totton v. Long Lake Lbr. Co.*, 61 Ida. 74, 97 P. (2d) 596; *Clayton v. Hercules Min. Co.*, 63 Ida. 301, 119 P. (2d) 890.) On such appeal, in the absence of fraud, this court may affirm or set aside such order or award, but only upon the following grounds, to-wit: (1) That the findings of fact are not based on any substantial, competent evidence; (2) that the board has acted without jurisdiction or in excess of powers; (3) that the findings, order or award were procured by fraud; and (4) that the findings do not, as a matter of law, support the order or award.

We are only concerned with secs. (1) and (4) above stated. Calling particular attention to findings of fact numbered XI and XII, supra. We must sustain the findings of fact of the board if there is *any* competent evidence to sustain such findings.

We will not set out all the testimony of witnesses for or against the correctness of the board's findings, to do so would extend this opinion unnecessarily.

The rule is settled in this jurisdiction that where facts presented by the testimony of witnesses, stipulated or otherwise, in compensation proceedings are conflicting and there are facts appearing which, if uncontradicted, would be sufficient to sustain the order appealed from, the order will not be reversed. (*Stroscheim v. Shay*, 63 Ida. 360, 120 P. (2d) 267, and cases therein cited.)

In *Golay v. Stoddard*, 60 Ida. 168, 89 P. (2d) 1002, it is held:

"The burden was upon respondent, as urged by appellants, to prove she suffered a personal injury by accident arising out of and in the course of her employment. (*Brooke v. Nolan*, 59 Ida. 759, 87 P. (2d) 470; *Croy v. McFarland-Brown Lumber Co.*, 51 Ida. 32, 1 P. (2d) 189; *Larson v. Ohio Match Co.*, 49 Ida. 511, 289 P. 992; *Hawkins v. Bonner County*, 46 Ida. 739, 271 P. 327; *Walker v. Hyde*, 43 Ida. 625, 253 P. 1104.)"

Under the affirmative allegations in respondents' answer it was incumbent upon respondents to establish that appellant had, on March 26, 1942, recovered from the

accidental injuries sustained on February 24, 1942; that all the disease symptoms that had become lighted up by reason of said accidental injuries had subsided; that all treatments received by him subsequent to March 26, 1942, were not on account of the accidental injuries sustained, but on account of his diseased thyroid, heart condition and other numerous physical ailments with which he was afflicted prior to the accidental injuries, and that his total disability was due to, or brought about by, the jeopardy of the criminal charges, and not by the accidental injuries sustained as aforesaid.

In other words, it is the contention of appellant that his total disability resulted from the accidental injuries received on the 24th day of February, 1942. On the other hand, it is the contention of respondents that his total disability is the result of, and is caused by, the physical disabilities or diseases with which he was afflicted prior to the accident and injuries sustained on that date.

In *Butler v. Anaconda Copper Min. Co.,* 46 Ida. 326, 268 P. 6, it is said:

"In determining whether there is sufficient evidence to support a finding of the board the same rules are applied by an appellate court as are applied when a verdict of jury or finding of a court is reviewed. The determination of questions of fact is for the board and a finding supported by positive evidence or logically inferred from circumstances will not be disturbed."

In *Watkins v. Cavanagh,* 61 Ida. 720, 107 P. (2d) 155, the following language is found:

"* * * it was for the board to determine under all the evidence the degree of disability."

It was a question of fact for the board to determine whether or not claimant's disability was due to the accidental injuries sustained, and the cause and the degree of such disability; whether he was totally healed on the 26th day of March, 1942, and whether or not his total disability from which he now suffers was due to the accidental injuries or to the physical ailments and diseases with which he was afflicted.

Almost every type of disease known to man has, at one time or another, been claimed or found to be casually related (by origin, causation or by aggravation and hasten-

ing) to the employment. Whether or not there is such a relation is a question of fact to be determined by the board.

██ The credit and weight to be given the testimony of witnesses in compensation cases is for the Industrial Accident Board. (*In re McKenzie*, 54 Ida. 481, 33 P. (2d) 113; *Fackenthall v. Eggers Etc. Co.*, 62 Ida. 46, 108 P. (2d) 300; *Benson v. Jarvis*, 64 Ida. 107, 127 P. (2d) 784; *Bussy v. Industrial Accident Commission*, (Cal.) 79 P. (2d) 169.)

August 19, 1941, approximately six months prior to the accident, Dr. Harry L. Willson, at the request of the Traveler's Indemnity Company, respondent's surety, examined appellant to ascertain his physical condition. Dr. Willson testified, in part, as follows:

"Q. Did you have occasion to observe or see him [Clark] on August 19, 1941?

"A. I did.

"Q. And for what purpose did you see him at that time?

"A. He was sent there by the Sperry Elevator Company his employer for physical examination.

"Q. Did you make a physical examination of him at that time?

"A. I did.

"Q. Did you make a written memo, or report of his physical condition at that time?

"A. I sent a written report to the company.

"Q. Handing you what has been marked Defendant's Exhibit No. 5 for identification, I will ask you what that is?

"A. That is the examination report that I sent to the Sperry Elevator Company.

"Q. And does it bear your signature?

"A. It does.

"Q. Does it bear Mr. Clark's signature?

"A. It does.

"Q. * * * what was his condition at that time?

"A. Well, as to the physical examination, it says in this blank—enter here, by name only all diseases and defects and nothing else, and I entered in that space, exophthalmic goiter, myocarditis, varicose veins in both legs, right ulcerated, but now healed; marked tremor, increased

reflexes. That was my final diagnosis of the man's condition.

* * * *

"Q. Now, Doctor, on the exhibit you have noted that he was at that time suffering from exophthalmic goiter?

"A. Yes.

"Q. Will you explain to the Commission what that term means?

"A. Exophthalmic goiter is the toxic type of goiter. It takes its name exophthalmic from the prominence of the eyeballs which occurs with the disease, and it is characterized by rapid pulse, tremors, increased blood pressure, and usually but not always,—in this case it was present, actual visible and palpable enlargement of the thyroid gland.

"Q. Now you have also noted there that he was suffering from myocarditis?

"A. Yes.

"Q. Will you explain that term?

"A. Myocarditis means a weakness of the heart muscles. It is very common in toxic goiters, particularly where they have been of some standing. The heart muscle gets poisoned and becomes weakened, and is also burdened by the increased rate at which the heart beats as the result of the toxic absorption of the diseased condition.

"Q. In the case of Mr. Clark, did you observe any degeneration, or anything of that kind concerning the heart?

"A. Yes, that is my diagnosis, and he also had cyanosis, and irregular heart beats.

"Q. What is cyanosis?

"A. Discoloration, or blueness of the face or fingers or finger nails or whatever portion of the body it may be,— it is darkened.

"Q. What causes that?

"A. A number of things might cause it. In this particular instance, I thought it was due to his thyroid condition and his heart condition.

"Q. Can you tell from your observation of Mr. Clark at that time whether this goiter, this myocarditis and varicose veins, the nervous tremors, and so forth, whether or not that was a temporary matter or whether that was a matter of some long standing?

"A. It was a matter of long standing. That don't all develop immediately. Furthermore, there is no contention on his part.—I asked Mr. Clark how long he had the goiter and he said he had had the goiter for twenty or twenty-five years.

"Q. Now, while you were talking to Mr. Clark there, did you discuss with him what you had found?

"A. I did.

\* \* \* \*

"Q. The things that he had wrong with him, are those the type that are progressive?

"A. They are progressive if there isn't active treatment instituted to stop their progress."

Dr. Willson testified, in substance, and his testimony is borne out by Dr. Cline, that appellant had, for many years, been afflicted with various physical ailments prior to the date of the accidental injuries, *and that trauma was not a factor in his trouble;* that the increase in his symptoms was due to the mental strain and worry over conditions which had arisen subsequent to the accident and had been hanging fire for a number of months, and that they had aggravated his symptoms; that the effect of the injuries could not have been too serious for the man to recover in such a short time, and the record indicates that his recovery was quite rapid; that the physical trauma of the explosion incident had very little to do with appellant's present condition, which was due to "the natural progress of the diseases," and to questioning and strain and the turmoil to which the man had been subjected ever since the accident; that a non-toxic goiter could not become a toxic goiter within a few hours by the application of external trauma; that appellant's goiter was not dormant in August, 1941, but very active, and that appellant's condition would gradually grow worse, and he would not be able to work at all without treatment; that he might do some work but it would damage him.

The following question was asked Dr. Willson:

"Suppose that the injuries were suffered as indicated by the report here from the hospital, would you say that a man would have sufficient time to recover from all those injuries?"

To which he replied:

"From all the injuries on the report? Apparently he recovered from those in about six days."

Dr. Cline testified that he examined appellant April 29, 1943, and found that he had, among other things, "an enlarged hyperplastic goiter. Marked tremors. Irregular heart action with some decompensation. Blood pressure 150 over 90. * * * periarthritis and neuritis of the right shoulder and arm, and hyperplastic goiter. This periarthritis and neuritis could be of long standing. The goiter is of long standing." He also testified that the heart was decompensated and the muscles weakened, and from the history it had existed for several years, and that, without treatment, the condition would progress; that the emotions of one suffering with goiter effects the toxicity of the goiter. "From the reports that I read here of Dr. Willson and Dr. Mellor, and the history Mr. Clark gave me, and from my own examination, I would say Mr. Clark's having a toxic goiter for a long time had a very definite effect upon his heart and his general condition. * * * and hence trauma is not a factor in his trouble."

On direct examination Dr. Mellor testified, on behalf of appellant, as follows:

"I have not made a complete physical examination of this man for several years, but I am assuming that on the fact that he was working as usual, and that his appearance was one of health, and that on my questions regarding his physical condition as to how he felt, he always responded that he was fine, *but it has been some years, several years, since I last examined him.*" (emphasis ours)

Dr. Mellor treated appellant shortly after he reached the hospital on February 24, 1942, and discharged him on the 2nd of March. On the 4th of March, two days after appellant left the hospital, he was visited by Mr. Matthies, his employer's manager, at his home, and was asked whether he was able to go to Idaho Falls on the afternoon of that day to discuss the loss of the elevator with a representative of the insurance company, and he said he was. Appellant went to Idaho Falls and met Mr. Sam Waugh and Mr. Matthies at the Rogers Hotel, and discussed at length the fire and the wheat in the elevator, and his employment with General Mills, Inc., was terminated at that meeting. That same day, after returning to his home, he drove his car to

the home of a neighbor, Thurman Simmons, and purchased 1,000 bushels of wheat, for which he gave his check for $900.00. Appellant testified that his mental faculties were affected subsequent to his leaving the hospital March 4, 1942, and for a year thereafter; that he had no recollection of any business transactions, and denied that he had any recollection of buying wheat from Simmons or giving his check therefor, and numerous other transactions. Appellant met and discussed matters concerning the fire and the wheat in the elevator with different parties at different dates subsequent to his discharge from the hospital. There is testimony in the record to the effect that in all these conversations and transactions no impairment of appellant's mental faculties was noticed by the witness.

Following an investigation on March 15, 1942, being the next day after an examination of appellant with reference to the fire and wheat in the elevator at the time of the fire, appellant again entered the hospital in a highly nervous condition. He was charged with forgery and arson, preliminary examinations were had on these charges, and appellant admitted that as a result of the charges, preliminary hearings, and pending trials, it had made him nervous and caused him to lose weight.

It may be clearly inferred from the record that appellant's return to the hospital on March 16, 1942, was not due to the accidental injuries, but to the mental strain and stress and uncertainty caused by the various criminal charges filed against him, augmented by the preliminary examinations held subsequent to his arrest, which had a damaging effect upon his physical condition.

Appellant testified that prior to the accident he was in good health; that he did not have rheumatism in the fall of 1941 or in January, 1942, and that he still did not have rheumatism; that he never complained to his employer that he had rheumatism. He denied writing a letter to Mr. Matthies in which he stated that he had rheumatism in his arm and shoulder during the fall of 1941, and denied knowing what rheumatism is. On January 2, 1942, he wrote a letter to Mr. Matthies wherein he stated: "I have had quite a lot of rheumatism in my arm and shoulder all fall and winter." Claimant also denied having any heart trouble prior to February 24, 1942; denied having had trouble with goiter for 35 years; denied that he had any heart trouble

in August, 1941, and denied having any heart trouble until after the accidental injuries. He denied that any doctor had told him that he had heart trouble, and denied that any doctor ever told him he had myocarditis or exophthalmic goiter or varicose veins, and he did not know what varicose veins are.

The record discloses that Dr. Willson informed him of his physical ailments August 21, 1941, and that at that time it was clear from the testimony that he had all the physical ailments of which he now complains, with knowledge of that fact, and that such ailments were progressive in nature, and required treatment or surgical operation to stop their progress. Appellant took no treatments and refused to submit to an operation.

■ It was for the Board to decide, from all the testimony presented, whether or not appellant's permanent total disability was the result of the accidental injuries, or whether it was the result of the numerous physical ailments, progressive in their nature, with which he was afflicted prior to his injury. Existing disability, or disability arising by reason of physical afflictions existing prior to the accident, and in no way connected with or aggravated by the accidental injuries, are not compensable.

■ There is sufficient substantial, competent evidence to support the board's findings that claimant's present total disability did not result from the accidental injuries sustained, but is due to the numerous diseases, progressive in their nature, with which he was afflicted prior to the accidental injuries, and did not arise out of or in the course of his employment.

The order appealed from is affirmed. Costs awarded to respondents.

Holden, C. J., and Ailshie, Givens and Dunlap, JJ., concur.