(No. 6781.   September 4, 1940.)

NELLIE V. KNIGHT, Appellant, v. HARRY YOUNKIN and NORTHWEST INDEMNITY EXCHANGE, Respondents.

[105 Pac. (2d) 456.]

Wm. D. Keeton and N. D. Wernette, for Appellant.

Nelson & Nelson, for Respondents.

MORGAN, J.—In the matter of procedure before the industrial accident board this case closely resembles *Hamlin v. University of Ida.*, 61 Ida. 570, 104 Pac. (2d) 625. In each of these cases the testimony was taken by two members of the board in Spokane, Washington. In this case the attorneys for the parties litigant stipulated that the hearing which had been set by the board to be held in the court house at Wallace, the county seat of Shoshone County, Idaho, be vacated and that it be held November 8, 1939, at Spokane, Washington, commencing at one o'clock P. M., at some suitable place in that city to be designated by the board. It was stated in the stipulation:

"And it is hereby stipulated by said parties through their attorneys that the question of jurisdiction with reference to said hearing being had in Spokane, Washington, is hereby waived by all the parties, and jurisdiction is hereby conferred on said Industrial Accident Board to have said hearing at said Spokane, Washington, as above set forth with like force and effect and binding on all the parties the same as if said hearing had been held in the State of Idaho. That at said hearing, all parties shall have the right to introduce any and all evidence that they respectively see fit."

The board designated the Davenport Hotel, in Spokane, as the place where the hearing should be held and it was held there at the time stipulated. The parties were represented by their counsel, who participated in the hearing, and all testimony in the case was taken thereat. After the trial the members of the board returned to Boise where findings of fact, a ruling of law and an order were made that claimant, appellant herein, take nothing by the proceeding and that the application for compensation be dismissed. This appeal is from the order.

Neither the parties nor their counsel have questioned the validity of the hearing held outside the state. However, at the conclusion of the oral argument on appeal to the supreme court, we called for briefs with respect to its validity and they have been furnished. The question is as to whether there is any legal evidence, or conduct or stipulation which will take the place of legal evidence, to sustain the findings of fact, ruling of law and order appealed from.

An officer, administrative board or court of a state cannot legally hold hearings, or conduct trials, beyond its borders. (*Board of Commrs. of Marion Co. v. Barker*, 25 Kan. 258; *Phillips v. Thralls*, 26 Kan. 780; *McGarry v. Industrial Com.*, 64 Utah, 529, 232 Pac. 1090, 39 A. L. R. 306; *Warren City Tank & Boiler Co. v. Millham*, 132 Okl. 244, 270 Pac. 85; 14 Am. Jur. 418, sec. 223.) Jurisdiction to hold such a hearing or trial cannot be conferred by stipulation or agreement of the parties. (*New Amsterdam Casualty Co. v. Industrial Acc. Com.*, 66 Cal. App. 86, 225 Pac. 459.) In 21 C. J. S. 127–131, sec. 85, it is said:

"So, also, consent cannot cure jurisdictional defects resulting from the determination of matters by a person, judge, or tribunal not qualified or empowered to preside or to perform judicial acts, as by a court not legally in session because convened or sitting at the wrong time or place."

The members of the Idaho Industrial Accident Board cannot legally administer oaths in the State of Washington, and the answers of witnesses in this case, made in response to questions propounded to them at the hearing held in the Davenport Hotel, must be treated as unsworn statements.

I. C. A., section 43–1404, contains this provision:

"The hearing shall be held in the city or town, or in such other convenient place within the county where the accident occurred, as the board may designate, . . . ."

The purpose of that provision is to make convenient attendance at the hearing by the parties litigant and their witnesses. When it does not meet the convenience of the parties and witnesses to have the hearing held in the county wherein the

accident occurred, the right to have it held therein may be waived. In this case the litigants and a majority of the witnesses did not reside in Shoshone County, Idaho, where the accident is alleged to have occurred, and it was more convenient for them to have the hearing in Spokane, Washington, than elsewhere. As heretofore pointed out, the parties, through their counsel, stipulated and agreed that the hearing should be held in Spokane. They have joined in requesting this court to treat the testimony so taken as the evidence in the case and it has been submitted to us to be used as the basis of our decision on the merits.

The parties litigant, and their counsel, have acted in good faith in this matter with a view to conducting their litigation at a minimum expense. By treating their stipulation, filed with the board, and their requests made to us, as equivalent to an agreement that the witnesses heard in Spokane, would, if called and legally sworn, testify to the statements made by them at the Spokane hearing, this purpose may be accomplished. Under the circumstances of this case, and pursuant to the wishes of the parties litigant expressed by their counsel, we will base our decision on the facts disclosed by the transcript, as if they had been established at a hearing regularly held in Idaho.

October 28, 1938, Fred F. Knight, appellant's husband, was in the employ of respondent Harry Younkin, hauling saw logs with a truck and trailer, in Shoshone County, Idaho. Younkin carried industrial accident insurance for the benefit of his employees, including Knight, and respondent, Northwest Indemnity Exchange, was his surety. About three-thirty o'clock in the afternoon Knight passed along the road near the home of Ben Seitzer. In front of Seitzer's house the road goes up a slight incline to a point where there is a small level spot and then it descends a grade of about twelve per cent, a distance of about sixty feet, where it crosses a culvert. There is a slight curve in the road between the top of the hill and the culvert. It appears that Knight, with the truck and trailer loaded with about three thousand feet of logs, board measure, stopped at the top of the grade; that he started and proceeded from the top to the bottom of the grade with-

out following the curve; that one of the front wheels of the truck missed the end of the culvert and struck a tree standing on the side of the road with sufficient force to break the chain holding the logs.

Immediately after the wreck Knight's dead body was found lying along the seat of the truck, with the feet near the pedals, the head out of the window in the door of the cab and the back of the neck was resting on the door where the glass had been lowered into it. The engine was in neutral and the emergency and air brakes were set. With respect to the condition of the body, Bill Wakefield, called on behalf of appellant, stated:

A. "By taking his head in my hand there was a place right above the back-bone in his shoulders about an inch or inch and a half that you could take your finger and put it in between the vertebrae.

Q. "Did you do that?

A. "Yes.

Q. "While you were doing that did you see Mr. Stapish, the coroner, doing the same thing or practically the same thing?

A. "I did."

C. S. Stapish, a licensed embalmer and funeral director, residing at St. Maries, Benewah County, Idaho, was called to take charge of the body of Knight at the request of the coroner of Shoshone County. He did so and stated with respect to his findings on making an examination of the body, as follows:

"I looked for broken bones and any other injuries and couldn't find any. . . . . The lack of injury is probably as pertinent as an injury. I was looking for injuries and found none except the neck seemed limp and I worked with that. When I turned the head I seemed to hear a slight creaking and I felt of the neck and in the back, the sixth cervical vertebra seemed to be depressed forward and I could put practically the entire both of my fingers up in the space, evidently between two vertebra or on a third vertebra between two others. There was a depression such as I have never seen before.

Q. "Which vertebra was that between or the approximate location of the neck where you found this depression?

A. "As near as I can tell I would say it was the sixth cervical depressed between the fifth and seventh.

Q. "Was that depression in the back of the neck the same place where his neck was over the door?

A. "Yes. It corresponded exactly."

Dr. Frank R. Patton, a physician, called by respondents, stated, among other things, that he assisted in a post mortem examination of Knight's body October 31, 1938; that there were no bruises nor marks of violence on any part of it; that

"The right ventricle—the right coronary artery at a distance of approximately one and five-tenths centimeters from the opening was thrombosed, or plugged. The musculature of the left ventricle showed a purplish discoloration due to back pressure and damming back of the blood from the back pressure. . . . .

A. "The cervical vertebrae were explored from the base of the skull to the second dorsal vertebra. The bodies were removed exposing the dura and cord. There was no fracture or any area in which any injury could be elicited. The cord was smooth and glistening and showed no evidences of having been compressed in any area.

Q. "Did you bare the bones of the neck from the head down?

A. "The bones were bared from the base of the skull to the second dorsal vertebra.

Q. "Was there any evidence of trauma or injury there?

A. "None.

Q. "Were the bones in their natural location?

A. "They were.

Q. "Then the neck, the bones of the neck were in their normal position?

A. "They were.

Q. "That you discovered from sight, from baring them, didn't you?

A. "Yes. . . . .

Q. "Did you—I ask you whether or not you used every precaution to determine whether or not there was any sign of injury on every part of the body?

A. "We went over—examined the body thoroughly and made the regular examination of all the members to ascertain whether there had been any injury. As far as I was able I could find none.

Q. "What was your opinion as to the cause of the death of Fred Knight?

A. "Coronary thrombosis of the anterior descending branch of the left coronary artery."

Dr. James D. Edgar, a physician, who assisted Dr. Patton in making the post mortem examination, was called by respondents and examined, and his statements corroborate those of Dr. Patton as to the condition of the body and as to the cause of Knight's death. The following appears in the record of his examination:

Q. "Was there any sign as to the cause of this man's death from violence or trauma?

A. "No.

Q. "You heard Mr. Stapish testify to the condition this man's neck was in after he was found in the truck?

A. "Yes.

.Q "What is the condition of a man's neck with regard to being flexible or stretching prior to the time—after death?

A. "Like every part of our body, the muscles of our neck are in constant tension. As soon as death occurs that tension is loosed and it has always been noted that a body will increase from one-half to two inches in length after death and most of that increase is in the neck because it has lost this tension which keeps it movable. After rigor mortis sets in the flexibility is lost because of a chemical change. Rigor mortis after death from diseases not accompanied by a high fever usually takes some time; in deaths from high fever and violence rigor mortis comes on very rapidly. An increase in the neck from a half to an inch for some three or four hours after death would be a normal finding."

There is conflict in the statements of lay witnesses as to the apparent condition of Knight's health for a number of years prior to his death. Those produced by appellant stated he appeared to be a strong, capable, industrious laboring man during a number of years prior to his death. Those produced by respondents stated he appeared to be in frail health.

An amendment of article V, section 9 of the Constitution of Idaho, proposed by the legislature in 1935 (1935 Sess. Laws, 377) and ratified at the general election held in 1936 (1937 Sess. Laws, 498) provides:

"On appeal from orders of the Industrial Accident Board the court shall be limited to a review of questions of law."

In workmen's compensation cases, where the facts presented by the testimony of witnesses, stipulation or otherwise, are conflicting, and where facts appear in the record which, if uncontradicted, would be sufficient to support the order appealed from, it will not be reversed on appeal. (*Golay v. Stoddard,* 60 Ida. 168, 89 Pac. (2d) 1002; *Potter v. Realty Trust Co.,* 60 Ida. 281, 90 Pac. (2d) 699; *Rand v. Lafferty Transportation Co.,* 60 Ida. 507, 92 Pac. (2d) 786; *Brink v. H. Earl Clack Co.,* 60 Ida. 730, 96 Pac. (2d) 500; *Totten v. Long Lake Lumber Co.,* 61 Ida. 74, 97 Pac. (2d) 596.)

The facts of this case, disclosed by the record, bring it within the scope of the constitutional provision above quoted, and are sufficient to sustain the finding of the board that Knight's death was not the result of a personal injury by accident arising out of and in the course of his employment, but was the result of coronary thrombosis, which was not caused, nor in any manner affected by the wrecking of the truck.

The order appealed from is affirmed. Costs are awarded to respondents.

Holden, J., concurs.

Givens, J., concurs in conclusion.

Budge, J., did not participate in the decision, due to his absence.

AILSHIE, C. J. (Dissenting).—I am unable to find any substantial evidence to support the finding of the board in this case. I am satisfied from all the evidence in the case that the death of Knight was due to the accident in which he died and wherein his truck load of logs was wrecked. To me, it seems very clear that the man's neck was broken and his

death resulted from the sudden impact of the truck. The evidence of the coroner, and other witnesses who saw the body immediately after the accident, is definite and clear, that the man's neck was limp and his vertebrae was so driven out of its normal position that they could place one or two fingers in the depression.

I do not consider the opinion evidence of the Spokane physicians and pathologist as of any weight or value in this case; they did not see the body until some three days after the accident. In the meanwhile "the body had been arterially and cavity embalmed, both," at least two days before these experts examined it. The blood had been drawn from the body and rigor mortis had long since set up.

I think the judgment of the board should be reversed with directions to allow the claim.