(No. 7016. February 19, 1943.)

GEORGE COLE, Appellant, v. FRUITLAND CANNING ASSOCIATION, INC., Employer, and STATE INSURANCE FUND, Surety, Respondents.

[134 Pac. (2d) 603.]

Rehearing denied March 16, 1943.

George Donart and E. B. Smith for appellant.

Frank L. Benson for respondents.

HOLDEN, C.J.—This is a proceeding prosecuted by George Cole [hereinafter referred to as claimant] under the Workmen's Compensation Act to recover compensation from the Fruitland Canning Association and its surety. Claimant, a man 56 years of age who normally weighed from 145 to 150 pounds and was 5'6" tall, performed farm labor the greatest part of his life. August 7, 1941, he was employed by the Fruitland Canning Association at Fruitland as a brine mixer, at 35c an hour, seven days a week, averaging from 12 to 12½ hours a day. As a brine mixer, claimant filled large tanks with water, in which he mixed sugar and salt and then boiled the mixture. In performing these duties, he was required to carry 100 lb. sacks of sugar and small buckets of salt. On the night of September 7, 1941, sometime between 10:30 and 12:00 o'clock, while carrying a 100 lb. sack of sugar to empty into

the mixing tank which stood four feet high, claimant slipped and fell. He did not fall clear to the floor, but twisted his body sharply in regaining his balance. At that time, claimant felt a severe pain in his head and left hip. About 12:30 A.M., claimant urinated what looked to him like "pure blood". Neverthless, he finished his working shift and left for home at 1:00 o'clock A. M. On going to bed, he became very ill and at about 3:00 or 4:00 o'clock A.M., the family physician, Dr. Richard Woodward, was summoned. Dr. Woodward found claimant suffering from a very severe pain "radiating from the left kidney down around the anterior towards the bladder." The discoloration of the urine cleared up in from a week to ten days. September 17, 1941, notice of injury and claim for compensation was filed with the board. November 27, 1941, on the advice of the attending physician, Dr. Woodward, claimant went to Boise for an examination by specialists, who found claimant was suffering from a malignant tumor [cancer]. Claim for compensation was heard commencing December 18, 1941. February 4, 1942, Findings of Fact and Rulings of Law were made and filed, and on the same day the following order was entered thereon:

"WHEREFORE, IT IS ORDERED, AND THIS DOES ORDER, That the claimant, George Cole, be and he hereby is, awarded against the defendants, Fruitland Canning Association, Inc., Employer, and State Insurance Fund, Surety, and each of them, compensation in the sum of $41.45, and the additional sum of $58.00 for medical attendance."

The appeal to this court is from that order.

Claimant contends the board erred: In finding the "condition resulting from the cancer which appellant had in his left kidney was not caused by the accident he sustained on said September 7, 1941, or by any injury resulting therefrom"; erred in not finding "that the injury received by claimant, on the 7th day of September, 1941, * * * aggravated and accelerated to some degree the cancer which claimant, at the time of the accident, had in his left kidney," in that appellant insists "the evidence shows that the accident which appellant sustained on said date aggravated and accelerated the condition which he had in his left kidney and thereby precipitated a serious condition which necessitated prompt and operative procedure"; erred in finding "that as a result of such aggravation and accelera-

tion [condition in left kidney] resulting from such injury [of September 7, 1941] appellant was totally disabled for work from and after September 7, 1941, to October 2, 1941 only, and that on the last mentioned date, all disability for work resulting from such aggravation and acceleration and the condition resulting from appellant's injury ceased and subsided", and erred in finding claimant was not entitled to an operation for the removal of the kidney at the expense of the respondents, nor to compensation until he is surgically healed.

Broadly speaking, it seems to be the position of claimant that notwithstanding the fact he had a cancerous kidney at the time of the accident, he still, and nevertheless, is entitled to an operation and compensation until he is surgically healed, in that the injury he sustained aggravated and accelerated his pre-existing disease, and in support of that contention, cites and relies upon *Young v. Herrington*, 61 Ida. 183, 99 P. (2d) 441, pointing out, this court therein held:

"Where injury results partly from accident and partly from pre-existing disease it is compensable if the accident hastened or accelerated the ultimate result, and it is immaterial that the claimant would, even if the accident had not occurred, have become totally disabled by the disease." [To the same effect: *Hamlin v. University of Idaho*, 61 Ida. 570, 576, 104 P. (2d) 625.]

Respondents insist, however, "the doctrine that compensation is allowable for aggravation and acceleration of a pre-existing infirmity has been abrogated by the legislature and recovery is now limited to 'the additional disability resulting from the accident' ", citing and relying upon subsection (a), Chap. 155, 1941 S. L.

In 1941, the legislature amended Sec. 43-1123, I. C. A. [1941 S. L., p. 310], to read as follows:

"DEDUCTIONS FOR PRE-EXISTING INJURIES AND INFIRMITIES.—Except as provided in Sec. 43-111, Idaho Code Annotated.

"(a) If the degree or duration of disability resulting from an accident is increased or prolonged because of a pre-existing injury or infirmity *the employer shall be liable only for the additional disability resulting from such accident.*" [Emphasis ours.]

Claimant counters with an attack upon the constitutionality of this amendment, contending the title violates Sec. 16, Art. 3, of our Constitution, because, it is argued: "The subject of the purported act is not embraced in the title"; "the subject of the act is entirely unrelated to the title"; "the title relates to 'regulating compensation for additional injuries to infirm or previously disabled workmen', which is not an expression of the subject of the act", it is contended, in that the "subject [of the act] relates to:

"(a) Liability for additional disability resulting from an accident where the degree or duration of disability is prolonged because of pre-existing injury or infirmity;

"(b) Deduction of compensation previously paid for permanent disability from the amount of compensation provided for permanent disability to the same bodily member caused by a change in condition or subsequent accident."

█ Respondents, in turn, challenge the right of claimant to raise the question of the constitutionality of the amendment for the first time on appeal, citing *Brady v. Place* (also an Industrial Accident case), 41 Ida. 747, 242 Pac. 314. While the constitutionality of the statute involved in that case was apparently raised for the first time on appeal, this court did not determine whether the question could, or could not, be so raised. Instead, what the court held was this: That Brady, claiming compensation under the Workmen's Compensation Act, could not "avail himself of its provisions" and at the same time "question its constitutionality." Appellant, Cole, of course, did not rely upon the statute in question; therefore, is not barred by the rule announced in *Brady v. Place,* supra. Respondent suffered no prejudice because the question was not raised before the board. Appellant's challenge of the statute is, consequently, sufficiently timely.

Is, then, the amendment in question unconstitutional, for the reasons urged by appellant?

The title gave notice the act would amend Chap. 11 of Title 43 of the Workmen's Compensation Law by adding a new section concerning "Additional Injuries to Infirm or Previously Disabled Workmen." It will be observed that subd. (a) concerns, or relates to, "pre-existing injuries" to workmen. The subject expressed in the title to the amendment and the subject of subd. (a), while expressed in different language, are identical.

In the very early case of *State v. Doherty et. al.*, 3 Ida. 384, 388, 29 Pac. 855, this court said:

"Sec. 16, art. 3 of the constitution must be given a reasonable construction. It is sufficient if the act treats of but one general subject, and that subject expressed in the title. To hold that each subdivision of the subject, and each and every of the ends and means necessary for the accomplishment of the object of the act, must be specifically mentioned in the title, would greatly embarrass legislation, and accomplish no legitimate purpose."

And, in *Boise City v. Baxter, et ux*, 41 Ida. 368, 376, 238 Pac. 1029, this court, speaking of the unity of title and subject-matter, stated:

"It is said that if the provisions of an act all relate directly or indirectly to the same subject, having a natural connection therewith and are not foreign to the subject expressed in the title, they may be united in one act; that however numerous the provisions of an act may be, if they can be by fair intendment considered as falling within the subject matter legislated upon in such act or necessary as ends and means to the attainment of such subject, the act will not be in conflict with this constitutional provision; that if an act has but one general subject, object or purpose, and all of its provisions are germane to the general subject and have a necessary connection therewith, it is not in violation of this constitutional provision." See also *State v. Enking*, 59 Ida. 321, 82 P. (2d) 649, to the same effect, wherein the Idaho cases discussing and construing Sec. 16, Art. 3, Const. are reviewed at great length.

We conclude the title is amply sufficient to indicate the general scope and purpose of the statute (amendment) and that it is sufficiently comprehensive to give notice of the proposed legislation.

Having reached the conclusion the amendment is constitutional, what effect does subd. (a), supra, have upon the doctrine enunciated by this court in *Young v. Herrington* and *Hamblin v. University of Idaho*, supra, that where an "injury results partly from accident and partly from pre-existing disease, it is compensable if the accident hastened or accelerated the ultimate result, and it is immaterial that the claimant would, even if the accident had not occurred, become totally disabled by the disease"? Clearly,

the effect of that subdivision is to abrogate such rule in that it expressly provides that if the disability resulting from an accident is *increased* or *prolonged* because of a pre-existing injury or infirmity the employer shall be liable only for the *"additional disability resulting from such accident."* [Emphasis ours.] If, then, the injury sustained by claimant September 7, 1941, without reference to his pre-existing disease, made the removal of the cancerous kidney necessary, then, and in such case, claimant would be entitled to an operation to remove such kidney at the expense of respondents and to compensation until he is surgically healed. On the other hand, if appellant had fully recovered from the effects of the accident by October 2, 1941, as found by the board; in other words, if the removal of the diseased kidney was not made necessary by reason of the injury claimant sustained September 7, 1941, then and in such case, he would not be entitled to an operation and compensation.

In an effort to establish his claim to an operation at the expense of respondents and to compensation until surgically healed, appellant called Drs. Richard Woodward and James L. Stewart as witnesses. Dr. Woodward testified:

"Q. What have you diagnosed him [claimant] to be suffering from, Doctor?

"A. Now?

"Q. Yes?

"A. Well, from Dr. Jeppeson's report in Boise, I believe he has a malignant growth of the left kidney—cancer of the left kidney.

"Q. Have you an opinion as to whether or not he [claimant] should have an operation?

"A. He should have.

"Q. What operation?

"A. Exploratory, if for nothing else to determine the exact nature of the condition—after that he should have the kidney out.

\* \* \*

"Q. Have you an opinion as to the cause of his present affliction—if you have, just answer yes or no?

"A. Yes.

"Q. What is that opinion?

"A. That the injury either caused or aggravated the condition he has at present.

"Q. With reference to your testimony to the effect that you felt this man had a malignant growth of the left kidney, have you an opinion as to whether or not the accident as related to you aggravated or accelerated that condition?

"A. It has.

"Q. Answer yes or no?

"A. Yes.

"Q. What is that opinion?

"A. It has aggravated it. You said if he had a malignant condition, would the injury aggravate or accelerate it?

"Q. Yes.

"A. It has.

\* \* \*

"Q. Taking into consideration the immediate pains that this man had when he sustained this accident on the evening of September 7, 1941, in his left kidney region, and the fact that he has continued to suffer pain in that region ever since, the fact that theretofore he never had pain— didn't know what is was—didn't have any pains or aches in the left kidney region. Have you an opinion as to whether or not this accident was the precipitating factor of his disability?

"A. Yes.

"Q. What is your opinion, Doctor?

"A. That it has been.

"Q. And is?

"A. And is.

"Q. You have an opinion, have you not, that if this is a malignant tumor—strike that. If this man suffers from a malignant tumor of his left kidney, what is your opinion as to whether or not the accident caused the malignant tumor?

"A. That it probably didn't cause the malignant tumor.

"MR. SUPPIGER: What was that answer?

"A. That it probably didn't cause the malignant tumor.

"Q. But the accident aggravated and accelerated it— that is your opinion, is it not?

"A. Yes.

"Q. What, in your opinion, should be done?

"A. He should be operated."

Dr. James L. Stewart testified:

"Q. * * —Doctor, what is your diagnosis of the condition which Mr. Cole suffers from?

"A. From my first examination, I diagnosed him as having a possible tumor of the left kidney.

* * *

[After having stated the hypothetical facts relative to claimant's condition, counsel propounded the following question.]

"Q. * * * Taking into consideration the facts that I have related to you, Doctor, and the matters disclosed which you have testified to upon your examination of Mr. Cole, I will ask you if you have an opinion as to the cause of Mr. Cole's present affliction?

"A. Yes.

"Q. Will you state what that opinion is, Doctor?

"A. Well, that he was—first—that he suffered an injury to the left kidney at the time of this accident and, second— that the injury to the kidney possibly accelerated a growth, that is a silent growth which he probably had in the kidney at the time of the injury.

"Q. Have you an opinion as to the kind of treatment which ought to be accorded Mr. Cole?

"A. In that type of thing, about the only treatment that I know of that could be considered successful would be the removal of the whole kidney."

Drs. F. B. Jeppeson and Alfred M. Popma were called on behalf of respondents. Dr. Jeppeson testified:

"Q. You made an examination?

"A. I made an examination of the entire urinary.

"Q. Did he give you a history of his case?

"A. Yes.

"Q. State what that history was.

"A. He told me that for at least five years prior to September 9, 1941 [the date Dr. Jeppeson first examined claimant], he had noticed blood in his urine at least once a year. He also told me about slipping with the sack of

sugar two days prior to coming in. There was nothing else pertinent. That was September 9, when I saw him. I may have said September 7th, it was September 9th.

\* \* \*

"Q. Now, * * *, taking into consideration your examination of the claimant, the history which he related to you, and the x-rays which you have examined, I will ask you whether you have an opinion as to whether the injury which he claims to have sustained on September 7th has any connection with the condition of tumor as it, I will say, as it was at the time you examined him and took plates?

"A. We certainly—at least I don't—pay much attention to anything the patient says in that respect because any patient who has blood in the urine can always find something to blame it onto. They always think of whatever they are doing, lifting, or jumping or whatever it is. You don't assume it has anything to do with the disease until you have made an examination and found something else.

"Q. The question is, do you have an opinion as to whether or not it had any connection with this accident?

"A. I think it had nothing to do with it."

On cross-examination, Dr. Jeppeson testified:

"Q. What is your opinion as to whether this kidney ought to be removed?

"A. It should have been removed a long time ago.

\* \* \*

"Q. Do you think the man's life is endangered so long as this operation is delayed?

"A. Yes.

"Q. Do you think he has some chance of recovery if the operation is pursued?

"A. That would depend on what the x-ray films of the lungs and bones show.

"Q. If they come clear from a diagnostic standpoint, do you think the operative procedure ought to be pursued?

"A. Yes.

"Q. Just as quickly as possible?

"A. Yes.

"MR. SUPPIGER: What could be shown by an operation that would indicate to you that the accident had anything to do with the condition?

"A. Nothing.

"MR. SMITH: Do I understand you to say that nothing could be disclosed by the operation would change your opinion as to whether or not the accident had anything to do with it?

"A. Nothing.

"Q. Do you specialize?

"A. Yes.

"Q. In what?

"A. Urology.

"Q. What does that cover?

"A. Diseases of the genito tract in the male and of the urinary tract in both sexes.

"Q. Including the kidneys?

"A. Yes.

"* * * ."

On re-cross examination:

"Q. In the affliction which Mr. Cole suffers?

"A. He has a neoplasm of the kidney which he has probably had for five years.

"Q. You recognize, do you not, that this injury caused an aggravation of that condition?

"A. No.

"Q. In other words, your theory is that this is just a happenstance or coincidence?

"A. Yes.

"Q. Something that would have happened anyway?

"A. Yes.

* * *

"Q. Taking the facts into consideration, the various facts that he testified to, wouldn't you have some opinion as to the accident—up to within a certain point between ten-thirty and eleven o'clock on the evening of September 7, 1941, he was able to do his work and thereafter wasn't and has never worked up to the present time?

"A. These tumors always start bleeding sometime, and

merely blood in the urine an hour or a day wouldn't incapacitate a man. It would be painful while the clots were going through the ureter. As the tumor grows, the patient loses weight and strength, the older it gets the larger it gets and the faster it grows. He would not be able to work one second and not the next. [Sic.]

* * *

"Q. The fact that this man urinated within half an hour to an hour and blood appeared in the urine, would indicate a rupture had occurred?'

"A. No.

"Q. What?

"A. No. These tumors, they invade the pelvis, that's the common thing'.

* * *

"A. It shows on the film where the tumor has invaded the pelvis.

"Q. You think it came from a rupture of the tumor tissue causing the blood?

"A. No, not a rupture of the tumor.

"Q. Maybe I am——

"A. He gave a history of having bled at least once a year for the last five years and the tumor would have to invade the pelvis of the kidney some place to produce that."

On re-direct examination:

"Q. Could it be the result of an injury, this condition that you have described—would it be the result of an injury?

"A. I don't think so."

Dr. Alfred M. Popma testified:

"Q. What causes the tumor that you find in the malignant tumor?

"A. We do not know what causes malignant tumors to begin and grow.

* *·*

"Q. I will ask you to take into consideration the facts stated therein [referring to a hypothetical question propounded earlier to Dr. Stewart], also the x-rays of Mr. Cole which you have examined, and I will ask you if you·

have an opinion as to whether the injury which was described in the hypothetical question aggravated the tumor which we find in Mr. Cole's kidney—whether it aggravated or accelerated the condition. The question is, have you an opinion as to—

"A. It is my opinion that the injury which he received on the specified date had no effect whatsoever on the tumor in the kidney.

* * *

"Q. Would this injury or tearing of the muscles in the lumbar region have any effect on the tumor?

"A. No, it wouldn't.

"Q. I will ask you if, also, if the injury in any way induced the passage of blood from the kidney through the ureter, I believe you called it—

"A. The ureter—No, I think this was just a coincidence.

* * *

"Q. Assuming that at the time the claimant had the accident, that he did have a rupture or a tearing of a part of this cancerous mass in the kidney, how long would it take such a mass to repair itself?

"A. I would estimate that from ten days to three weeks would be required for complete repair."

On cross-examination:

"Q. All right, you have testified to a rather serious affliction in Mr. Cole's left kidney, have you not?

"A. I have.

"Q. You really thing it is serious?

"A. Very serious.

"Q. Something that should be removed as quickly as possible.

"A. It should have been done a long time ago.

* * *

"A. In this particular instance, to me it means the man just started to bleed from the kidney tumor.

"Q. Would the fact that he had extreme pain at the time he slipped have any effect on your answer, Doctor? He had extreme pain in the region of the left kidney and above the left hip?

"A. I don't think that had anything to do with his bleeding.

\* \* \*

"A. I still think, in going over the facts, that the injury which he sustained did not cause this kidney to bleed.

"Q. But it did aggravate the condition that he suffered in the kidney, didn't it, Doctor?

"A. I don't know how it could."

Claimant testified:

"Q. Mr. Cole, did you go deer hunting this fall?

"A. I went out with the boy on a deer hunting trip.

"Q. When was this?

"A. That was the next day after I left the hospital. I don't know what day it was."

What does the testimony of these physicians, boiled down, show as to whether the removal of the cancerous kidney was, or was not, made necessary solely by reason of the injury claimant sustained September 7, 1941? Dr. Woodward testified from the report made by Dr. Jeppeson [to whom Dr. Woodward sent claimant], in his opinion: That claimant had a "malignant growth of the left kidney —cancer of the left kidney"; in other words, in his opinion, claimant had a malignant, cancerous growth of the left kidney; that in his opinion "the injury [referring to the injury sustained by accident September 7, 1941], either caused or aggravated" claimant's condition; that in his opinion the accident "aggravated or accelerated that condition", and that claimant should have an operation, "exploratory, if for nothing else to determine the exact nature of the condition—after that he should have the kidney out."

Dr. Stewart, who had examined claimant, in substance testified, in his opinion, that: "Claimant suffered an injury to his left kidney at the time of the accident; that the injury to the kidney possibly accelerated a growth, that is a silent growth which he probably had in the kidney at the time of the injury" and "in that type of thing, about the only treatment that I know of that could be considered successful would be the removal of the whole kidney."

Dr. Jeppeson, a specialist in urology and concededly an expert as to the matters about which he testified, and the

physician to whom Dr. Woodward, the attending physician, sent claimant, examined claimant only two days after the accident, giving him a more complete and thorough examination than any of the physicians, testified in brief: That claimant gave him a history of his [claimant's] case, in which he stated that for at least five years prior to September 9, 1941 [date of first examination], he [claimant] had noticed blood in his urine at least once a year; that in his [Dr. Jeppeson's] opinion the accident had nothing to do with causing the cancerous condition of the kidney, but "that it [the kidney] should have been removed a long time ago"; that claimant's "life is endangered so long as this operation is delayed", and that claimant should have an operation "just as quickly as possible"; that the injury caused by the accident did not aggravate claimant's condition and that his condition was something that would have happened anyway; that the fact claimant urinated within half an hour to an hour after the accident and blood appeared in the urine had nothing to do with the cause of claimant's condition, and that "these tumors [evidently alluding to tumors of a cancerous nature], they invade the pelvis, that's the common thing"; that "he [claimant] gave a history of having bled at least once a year for the last five years and the tumor would have to invade the pelvis of the kidney some place to produce that"; that he [Dr. Jeppeson] did not think the condition he had described was the result of the injury.

Dr. Popma testified in substance: That "we do not know what causes malignant tumors to begin and grow"; that "Q. I will ask you if, also, if the injury in any way induced the passage of blood from the kidney through the ureter, I believe you called it— A. The ureter—no, I think this was just a coincidence"; that the kidney should have been removed a long time ago; that "the injury which he [claimant] sustained did not cause this kidney to bleed"; that he did not know how the injury could have aggravated the condition claimant suffered in the kidney.

■ It will be noticed these physicians were agreed claimant had cancer of the left kidney and that they were likewise agreed the cancer, which Dr. Woodward described as *malignant,* should be removed without delay. On the question as to what caused the cancer, Dr. Woodward testified the injury "either caused or aggravated" claimant's condition; while Dr. Jeppeson, after having made a most

complete and thorough examination of claimant, testified the accident had nothing to do with causing the cancerous condition of the kidney, and that the kidney should have been removed "a long time ago"; and as to the appearance of blood in the urine, claimant, in giving the history of his case to Dr. Jeppeson, stated he had noticed blood in his urine at least once a year for a period of five years prior thereto. Evidence that a cancer antedating an injury should be promptly removed does not establish the claim that it was the injury, and not the malignant condition of the cancerous kidney, which made removal necessary, particularly in view of the testimony of Dr. Jeppeson to the effect the injury did not aggravate nor have anything to do with claimant's condition.

Where, as in the instant proceeding and as we have pointed out, there is substantial competent evidence to support findings, though conflicting, the findings will not be disturbed. [*Hill v. Wilkinson*, 60 Ida. 243, 247, 248, 90 P. (2d) 696; *Golay v. Stoddard*, 60 Ida. 168, 173, 89 P. (2d) 1002; *Knight v. Younkin*, 61 Ida. 612, 621, 105 P. (2d) 456; *Watkins v. Cavanagh*, 61 Ida. 720, 107 P. (2d) 155; *Bower v. Smith*, 63 Ida. 128, 118 P. (2d) 737, 740.]

The order appealed from is affirmed with costs to respondents.

Ailshie, Givens and Dunlap, JJ., concur.

Budge, J., dissents.