(No. 7091. May 24, 1943.)

VIRGIE BISHOP, surviving widow, on her own behalf and on behalf of her minor son EDDIE DeWAYNE BISHOP, Respondent, v. MORRISON-KNUDSEN COMPANY and J. W. BRENNAN, Employers, and UNITED PACIFIC INSURANCE COMPANY, Surety, Appellants.

[137 Pac. (2d) 963.]

808

J. F. Martin and E. B. Smith for appellants.

William H. Witty and Walter H. Anderson for respondent.

BUDGE, J.—This is an Industrial Accident case on appeal from an award in favor of claimant, respondent herein, surviving widow of Curtis Bishop, on her own behalf, and on behalf of Eddie DeWayne Bishop, dependent child of Curtis Bishop, now deceased, and respondent.

The pertinent facts found by the board and disclosed by the record, briefly stated, are as follows:

During his lifetime, Curtis Bishop was employed as a laborer, his principal occupation being that of a hard-rock miner. Between July 14, 1942, and July 27, 1942, inclusive, Curtis Bishop, hereinafter referred to as "employee" (approximately 51 years of age, and apparently in good health), while in the employ of appellants, Morrison-Knudsen Company and J. W. Brennan, as a common laborer, on July 18, 1942, and while engaged with other co-workers in unloading masonite from a railroad box-car at the U. S. Army Air Base near the City of Pocatello, and while standing on said masonite, either fell, or was knocked out of the car, to the ground between the box-car and the warehouse, a distance of from 4 to 6 feet; in falling he hit against a sliding door on the warehouse, lighting upon his rump, with his shoulders and back against the warehouse side. With slight assistance from his co-workers, employee rose to his feet, said he was not injured, and refused to go to a first aid station. After sitting around for a short time, employee resumed the work he had theretofore been doing, continuing work until five o'clock. Thereafter employee, upon reaching home, complained to his wife of pain in his back and left shoulder blade, and had a large red lump or swelling on his back. He ate sparingly of the evening meal and went to bed. Claimant applied hot towels and rubbing alcohol to her husband's back and shoulders. He complained of pain in his back and shoulders at different times during the night. The next morning claimant again rubbed her husband's shoulders and back with alcohol, and did so upon numerous occasions thereafter. Employee returned to work on each and every day up to and including July 27, 1942. He continued to work eight hours a day, and upon some days worked over time. However, covering practically this entire time and upon different occasions employee complained to his fellow-workmen and to claimant that his shoulder was stiff and that he suffered pain in his back. The record discloses that he (Bishop) was unable to sleep; that it was necessary to keep him propped up in order that he might breathe without experiencing great difficulty, and his pain might be lessened, thereby obtaining some sleep. On July 27, 1942, he complained to one of his fellow-workmen that he was sick and ceased working. On July 28, 1942, he visited Dr. West, a chiropractic physician, who made a

general examination of employee, and who testified that the examination disclosed nothing abnormal except that the muscles through the region of employee's back "were extremely tender and tense;" that his "heart was extremely slow" and "seemed to be laboring," and at the time of the examination of the employee the swelling and discoloration on his back and shoulder had disappeared. After the examination employee went home. He lay down during the day and that night he had trouble with his breathing and had to keep in a certain position to breathe; he suffered pain constantly in his back and shoulder, and on the morning of July 29, 1942, employee died.

On July 31, 1942, an autopsy on the body of the deceased was performed by two physicians. The board found "that at said autopsy no evidence of injury of any kind was disclosed but a marked pleurisy in the left lung and over the chest and at the base of the left lung and diaphram was found, also that the coronary vessels which supply the heart with blood were markedly stenosed, or filled in due to fatty change or arteriosclerosis and that there was marked fatty infiltration and the heart muscle was poor quality and that the arteriosclerosis was generalized and especially marked in the kidneys; that the said stenosis of the coronary vessels and the arteriosclerosis existed for some time prior to the time the employee entered the employ of the above-named employers and continued to exist until his death."

Dr. West testified, in answer to the following questions:

"Q. Now, Doctor, what was the history given you at the time of this accident?

"A. He stated that he was unloading masonite boards from the box car. In turning the board around he was pushed part way out and fell backwards between the car and the storehouse and lit on his shoulder.

"Q. Did you examine his shoulder?

"A. I did.

"Q. What did you find there?

"A. The muscles through that region of his back were extremely tender and tense.

"Q. And what was his blood pressure?

"A. Blood pressure, 118 systolic and 80 diastolic. Pulse 45.

"Q. What would be the effect of this condition you found in the future—what effect would that have?

* * *

"A. From an anatomical and physiological point of view the anatomy consisting of the upper dorsal—there are fibers that go to make up the brachial plexus and supply it alone. There are also fibers that turn inward and make up the ganglia. They are the nerve supply that affect the heart and also supply the lungs. * * *

* * *

"A. * * * he was apparently having quite a marked painful condition in the arms and shoulders. He said he had his wife rub and massage his arm and shoulder every night after he got home, and some times during the night in order to be able to sleep a bit. This extreme tenseness of the muscles in turn could affect those nerves that supply the arms. The brachial plexus goes through that region and that could be productive of the pain he was having.

"Q. Could or could not the condition you found there have been caused by the injury that he gave you the history of sustaining?

"A. Possibly.

* * *

"Q. * * * State whether or not, doctor, the condition that you found in the shoulder could have been caused by the injury of which he gave the history?

"A. It is very likely it could have been. *Yes.* (Emphasis ours.)

"Q. And would you say that or not, Doctor, that considering the fact that Mr. Bishop died within twenty-four hours after he was in your office, or a day after he was in your office—would you say that his death could have been caused from the condition which you found at the time you examined him?

* * *

"A. It is quite possible that sufficient injury could have been produced to interfere with those nerves and affect the action of his heart. Now, the heart was extremely slow."

Summarizing the testimony of Dr. West, it is apparent that the doctor was of the opinion that the injury was sustained as a result of the accident and was possibly, likely, or probably, the cause of his death.

Dr. John McMahan, in the course of his testimony, and in answer to a hypothetical question, substantially incorporating all of the material testimony offered on behalf of

claimant, up to the time the hypothetical question was asked, among other things, testified:

"Q. * * * What in your opinion probably caused the death of this man?

* * *

"A. It is my opinion that this accident caused severe shock and no doubt prompted the man's death."

Dr. McMahan testified positively that the injury sustained by deceased, as a result of the accident, prompted his death.

The testimony of Drs. Hegsted and Hughart is definitely to the effect that Bishop died as a result of complication of diseases.

The record discloses, without contradiction, that immediately following the accident and injury sustained by deceased, up to and including the time of his death, he suffered excruciating pain in his shoulders and back; he had great difficulty in breathing, was unable to rest or sleep, and in order to obtain a bit of rest or sleep it was necessary to prop him up; that he could not lie down in a normal way; that he complained to fellow-workmen of pain in his back, stiffness in his neck and shoulders practically every day after sustaining the injury; it also appears that deceased lost his appetite for food and lost weight subsequent to the injury.

Summarizing the testimony of claimant, among other things, she testified that when her husband came home on July 18, 1942, the date of the accident and injury, he told her he had fallen out of a box-car, and that his back was hurting him. Claimant undressed him and saw a large red lump between his shoulder blades and across his back. He ate very little that night, complaining all night of pain. On the following morning, he told his wife he was still so sore that he did not know whether he could work, but he would try it. On the second evening after the accident and injury, he told his wife his back was still sore and he still had pain, whereupon, she again applied household remedies. He continued to suffer during the second night and only occasionally could get in a position to be relieved, and told his wife he was dazed from the fall. On the third evening, he constantly complained of soreness and pain. Household remedies were again applied. He continued to complain of pain in his back and shoulders until his death on July 29, 1942. It appears from and after the injuries

sustained by the accident, he suffered continuously and uninterruptedly, with pain in his shoulders and back, lost weight, and had little appetite for food.

There is also evidence in the record that immediately following the accident and injury, the deceased fainted, and that beads of perspiration stood out on his face.

Claimant also testified that since their marriage, in 1924, her husband had never consulted a physician for any kind of ailment, except upon one occasion when he had had a foreign substance removed from one of his eyes.

From an award in favor of claimant, appellants appeal, specifying and relying upon eight assignments of error. We will discuss the errors assigned under one general head, the essential question being whether or not the findings of the board support the award. The board's findings No. 8 raises the material question here involved, which is as follows:

"That due to the employee's physician (physical) condition at the time of the fall, the fall which the said employee had on the said 18th day of July, 1942, as above described, and which fall was an accident arising out of and in the course of the employment with said employers, and the hard work the employee did thereafter *augmenting* the condition resulting from the fall, were the cause of the said employee's death on the said 29th day of July, 1942. (Emphasis ours.)

█ While "hard work" is not an "accident" nor an "injury," it may augment or accelerate the injurious results of an accident. (*Sonson v. Arbogast*, 60 Ida. 582, 94 P. (2d) 672; In re Soran, 57 Ida. 483, 67 P. (2d) 906; *Beaver v. M-K Co.*, 55 Ida. 275, 41 P. (2d) 605.) As we read and construe the foregoing finding (No. 8) of the board, it holds that the employee's death was the result of his accidental fall; and that the work the employee did *after* the accident simply *augmented the injury* (not the accident) and death resulted (probably more quickly) from the accident.

[2] It was a question of fact for the board to decide whether the death of deceased was the result of injury sustained by accident arising out of and in the course of his employment, or whether the cause of deceased's death was due to the accident and injury augmenting a preexisting physical condition with which deceased was afflicted, or whether the cause of death was due to disease.

Dr. McMahan, in answer to the following question, testified:

"Q. * * * Do you think the fall had any effect on him?

"A. Yes, it was a slow progressive effect, * * *. I think the fall rendered the original injury and the work augmented the condition of it."

Dr. Hegsted testified there was no complete stoppage of any of the blood vessels.

Dr. Hughart testified there was evidence of an abrasion on the back part of the shoulder and testified that there was evidence that the "skin was sloughing off," possibly a week or ten days old; that if the deceased fell, as the testimony shows, the deceased would get some shock and would have symptoms as the result of said shock.

After a careful examination of the record, and bearing in mind that proceedings under the Workmen's Compensation Law are not to be governed by strict procedure, but are to be liberally construed, which rule would apply to the board's findings of fact and the sufficiency thereof. (*Stroscheim v. Shay*, 63 Ida. 360, 120 P. (2d) 267), we are convinced that the findings of the board are sufficient; that they are supported by substantial and competent evidence and support the award.

It is urged that the board acted in excess of its powers for the reason that the case was presented to the board with two members holding the hearing under stipulation. The stipulation provided:

"May it be stipulated that in case the two members holding this hearing cannot agree upon their decision, the third member of the board may read the transcript *and take part in the decision to the same effect as though he were present at this hearing.*" (Italics ours.)

The members of the board who were present at the hearing were Messrs. Langley and Robison. The findings, rulings and award were signed by Mr. Robison and Mr. Suppiger. The latter did not sit at the hearing. Commissioner Langley did not join in the findings, rulings or award. The award, however, was made by a majority of the board. In the face of the stipulation, and particularly that portion underlined, we are not disposed to hold that the board exceeded its powers or jurisdiction. We are not called upon to decide whether or not the board, independent of the stipulation, would have the power to act as the board did in the instant case.

Other alleged errors are argued in the briefs directed to the inadmissibility of certain testimony of the doctors who conducted the autopsy. Since there is no cross-appeal, these matters are not here for review and we therefore refrain from discussing them.

This is a death case; which, being true, Sec. 43-1123, I. C. A., amended by Sess. Laws, 1941, Chap. 155, p. 310, has no application. Said amendment is limited to disability resulting from an accident, and so far as material here is as follows:

"43-1123. DEDUCTIONS FOR PRE-EXISTING INJURIES AND INFIRMITIES.— * * *

"(a) If the degree or duration of disability resulting from an accident is increased or prolonged because of a pre-existing injury or infirmity the employer shall be liable only for the additional disability resulting from such accident. * * *."

The above provision, no doubt, was copied from Title 26, Sec. 288, Code of Alabama, 1940, formerly Sec. 7561 of the Alabama Code, 1923, in which the following provision will be found:

"If the degree or duration of *disability* resulting from an accident is *increased or prolonged* because of a pre-existing injury or infirmity, the employer shall be liable only for the *disability* that would have resulted from the accident had the earlier injury or infirmity not existed."

In *United States Cast Iron Pipe, etc., Co. v. Hartley, et al.,* 217 Ala. 462, 116 So. 666, the court, in construing the above provision, held that said provision did not apply to death cases, and compensation allowable in death cases is not subject to abatement or deduction on account of the contribution of preexisting diseases to result. In the course of that opinion, the court uses the following language:

"It is too clear to permit of argument that this statute only applies to *disability,* not to death. Death in the sense dealt with in the Compensation Act can neither be 'increased' or 'prolonged.'"

In *Southern Cement Co. v. Walthall,* 217 Ala. 645, 117 So. 17, in construing said section above referred to, it is held:

"The apportionment of liability thus provided for is by the very terms of the statute referable to a state of disability, and not to a state of death. 'Disability' and 'death' are distinct conditions, so recognized throughout the Com-

pensation Law, and death cannot be included in 'disability' as here used.

"* * * So far as we are advised, no court has held that this limitation is or should be applicable to death cases."

Sec. 5341, Statutes of Conn., as amended by Public Acts 1919, Chap. 142, Sec. 1, as amended by Public Acts 1921, Chap. 306, Sec. 1, reads as follows:

"In any case of aggravation of a disease existing prior to such injury, compensation shall be allowed only for such proportion of the disability due to the aggravation of such prior disease as may reasonably be attributed to the injury."

In the case of *Biederzyski v. Farrell Foundry & Machine Co.*, 103 Conn. 701, 131 A. 739, in discussing said amendment, the following language is found:

"Defendants argue that, as the compensation for this employee's incapacity resulting from the injury was by this statute apportioned, it is inequitable not to apportion in the same manner the compensation as to the beneficiary on account of the death of the employee in the same manner. And, further, that this and other sections of the Workmen's Compensation Act make it reasonably clear that, when this amendment to Sec. 6341 [5341] provides that in case of aggravation of a disease existing prior to the injury compensation shall be apportioned for such proportion of the disability as may be reasonably attributed to the injury, it used the word 'disability' as applicable to the incapacity prior to the death as well as to the death resulting from the injury. We are unable to agree in this construction. The true construction seems to us so plain that we do not purpose a comprehensive analysis of the terms of this act in order to meet this argument. When the amendment uses the term 'disability' it manifestly uses it in the sense of incapacity, a use which prevails through the act. *If we are right in this, it would follow that the amendment we quote refers to the living, and not to the case of death.* Neither in this section nor in the entire act is disability used in the sense of death. And everywhere the act uses incapacity, total or partial, in the sense of disability. * * *

"* * * Death is a fixed fact which cannot be apportioned in the manner provided in the amendment to this section of the General Statutes."

In *Hill v. Travelers Ins. Co. of Hartford, Conn.*, 146 Iowa

113, 124 N. W. 898, the word "disability" is construed in the following language:

"The word 'disability' does not express the same meaning as the word 'death'; nor is it ordinarily used as signifying the same thing. 'Disability' is defined as a want of competent power, strength, or physical ability; weakness, incapacity, impotence." (*Hall v. Am. Employers Liability Ins. Co.*, 96 Ga. 413, 23 S. E. 310; *Rosenberry v. Fid. & Cas. Co. of N. Y.*, 14 Ind. A. 625, 43 N. E. 317; *Ferguson v. Penn. Mut. Life Ins. Co. of Philadelphia*, 305 Ill. App. 537, 27 N. E. (2d) 548; *Hinkley v. Penn. Mut. Life Ins. Co. of Philadelphia*, ........ .........., 37 Fed. S. 1018; *Fiore v. City of New York et al.*, 256 App. Div. 293, 10 N. Y. S. (2d) 195.)

We are of the opinion that the word "disability" as used in Chap. 155, Sess. Laws 1941, supra, does not mean, and was not intended by the legislature to mean, death. If the legislature had so intended it would have added after the word "disability" in said section, the words "or death."

■ Where the death results from an injury sustained by accident and preexisting disease contributing concurrently and effectively to employee's death, no apportionment can be made. Employee would be entitled to compensation had his disability not contributed to the accidental injury sustained.

■ It will be observed that the Alabama decisions and the Connecticut decision were rendered prior to the enactment of Chap. 155, 1941 Sess. Laws, supra. No doubt, the legislature took notice of the Alabama statute and the decisions based thereon prior to the enactment of Chap. 155, 1941 Sess. Laws, supra.

■ In *Mundell v. Swedlund*, 58 Ida. 209, 223, 71 P. (2d) 434, speaking through Mr. Justice Ailshie, this court held:

"It is a uniform rule adopted in this state, that, where a constitutional or statutory provision was adopted by the framers of the constitution or the members of the legislature from another state, which had already construed the provision prior to our adoption of it, it will be assumed that it was the intention of the framers or of the legislature to adopt the construction previously placed upon it by the courts of the state from which the provision was taken." Citing cases.

In *Allen v. O. S. L. R. R. Co.*, 60 Ida. 267, 90 P. (2d) 707, will be found the following statement:

"It is the established rule in Idaho that where a provision has been adopted by our legislature from the statutes of another state, which had been construed by the courts of that state, it will be assumed that the construction which had been placed upon it was also adopted."

To the same effect, it is held in *Girard v. Defenbach,* 61 Ida. 702, 710, 106 P. (2d) 1010:

"A statute which is adopted from another jurisdiction, including federal statute adopted by a state, will be presumed to have been adopted with the construction placed upon it by the courts of that state or country before its adoption."

It seems to be perfectly clear that Chap. 155 amending Sec. 43-1123, I. C. A., refers only to one kind of compensation, namely: disability compensation. The act, neither by reference, inference, nor otherwise can be construed to refer to or affect death benefits.

Our purpose in discussing Sec. 43-1123, I. C. A., amended by Chap. 155, subd. (a), p. 310, 1941 Sess. Laws is to avoid any misunderstanding which might arise from the case of *Cole v. Fruitland Canning Company* (to which the majority still adhere), recently decided in 64 Ida. 505, 134 P. (2d) 603, which was not a death case.

The award is sustained and it is so ordered. Costs to respondent.

Ailshie, Givens and Dunlap, JJ., concur.

HOLDEN, C.J. (Concurring specially.) — The board found (finding No. 8, quoted in the foregoing opinion) that Bishop's death was caused by the accident he sustained July 18, 1942 and, in effect, that the hard work he did immediately after the accident simply hastened his death. Therefore, I concur.