350 P.2d 345

Laura Elizabeth SUTTON, Surviving Widow, on her own behalf and on behalf of Michael Joseph Sutton and Mary Paula Sutton, Minors, Claimant-Respondent,

v.

BROWN'S TIE & LUMBER COMPANY, Employer, and Employers Mutual Liability Insurance Company of Wisconsin, Surety, Defendants-Appellants.

No. 8825.

Supreme Court of Idaho.

March 15, 1960.

Paul S. Boyd, Boise, for appellants.

Wm. M. Smith, Boise, for respondent.

**McQUADE, Justice.**

This is a proceeding for workmen's compensation death benefits in the death of Arthur R. Sutton, 31, an employee of defendant Brown's Tie & Lumber Company at its mill at McCall, Idaho.

Until he went to work for defendant corporation a week before his death, Sutton's employment had been mainly of a clerical and sedentary nature. He worked for Potlatch Lumber Company during the summer of 1951; his duties there are unknown. From 1952 until April 20, 1956, he was an insurance claims adjuster in California. During that period his duties required physical exertion for routine travel, walking and driving about, and interviewing.

He was next employed by Consolidated Mining and Smelting Company of Kinnard, B. C., in a clerical capacity. This employment continued until about June 3, 1958, which was the date Sutton moved his family to McCall and went to work for defendant Brown's Tie & Lumber Company.

At defendant employer's mill, he was assigned to work on the "dry chain." The dry chain is a conveyor, raised three and a half feet above the platform where employees move about while working; it carries smooth boards from a planer. These boards measured 8 inches wide by 1 inch thick, and from 6 to 16 feet long, and weighed from 6.4 pounds to 18.11 pounds. Sutton's job was to pull boards off the conveyor onto "bunks," sorting them by grade of lumber as he did so; boards were picked up from the bunks by carriers. Both parties describe the dry chain job as being light work, and the only work in the mill to which Federal law permits 16-year-olds to be assigned.

Sutton worked nine-hour shifts on the dry chain from Tuesday, June 3, through Friday, June 6. He worked five hours Saturday, June 7, and was off work Sunday, June 8.

On one or two occasions he complained of shortness of breath. He attributed this to the high altitude of McCall (approximately 5,000 feet).

On June 9, Sutton arose between 9 and 10 a m. He had breakfast, then went downtown shopping. About 2 p. m., the family had lunch, the large meal of the day.

Sutton went to work at 4 p. m. He performed his regular duties on the dry chain. He did not suffer any fall, nor did he slip nor do any sudden lifting. There was no speed-up in the work. He did not complain of being ill.

About 11 p. m., Sutton pulled on a board, then suddenly collapsed, falling against the dry chain and then to the floor. He made no outcry. A sudden tremor was noted. He gasped for air, and his eyes became glassy. He was taken to the McCall Hospital, where he was pronounced dead at 12:30 a. m. June 10. However, appellant and respondent indicate death actually occurred immediately after the attack.

An autopsy showed moderate sclerosis of the right coronary artery of the heart, and extreme arteriosclerosis of the left coronary artery. The autopsy report said the lateral descending branch·

"* * * is the site at its point of origin of extreme sclerosis, and here only a pin-point lumen is present. A small amount of what appears to be fresh thrombus occludes the lumen at this point. The descending left coronary· artery, while still the site of arteriosclerosis and narrowing shows no further clotting ·of· blood in· its lumen. The myocardium of the left lateral ventricle shows myofibrosis. Also present here are areas of hemorrhage. * * *"

Mrs. Sutton, the decedent's widow, brought this claim for death benefits on behalf of herself and two minor children, on the theory this was a death from industrial accident as defined in the Idaho statutes. The Industrial Accident Board, after hearing the evidence, entered an order granting benefits, from which order this appeal is taken.

Appellants set forth eight specifications of error. These, in brief, state the Industrial Accident Board erred in ruling ordinary work, as the causative factor of an injury, is an accident, there being no unusual exertion or physical or emotional strain connected with the job. Appellants further assert this was not an injury caused by accident arising out of and in the course of employment.

For an injury to be compensable, it must come within the following statutory definition:

"If a workman receives personal injury caused by an accident *arising out of* and in the course of any employment covered by the Workmen's Compensation Law his employer or the surety shall pay compensation in the amounts and to the person or persons hereinafter specified.

" 'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and *connected with the industry in which it occurs,* and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law.

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. * * *" I.C. § 72–201. (Emphasis added.)

The parties agree as to the facts surrounding the death of the decedent, but they disagree diametrically as to the interpretation of those facts. A hypothetical question posed to four doctors, as expert witnesses, tracing the decedent's work record, his medical history, and the circumstances of the heart attack, in effect amounted to a stipulation of facts.

Dr. Joseph Beeman, the pathologist who conducted the autopsy, testified in response to the hypothetical question, taking into consideration his own findings. He said in part:

" * * * he was just doing too much work for a heart in this condition.

" * * * when a heart is in this condition and he is doing manual labor, it is causing an increased strain on his heart and it precipitated the final thing that killed him.

\* \* \* \* \* \*

"It may get to a point where the heart muscle is deprived of sufficient blood and part of the heart muscle dies.

\* \* \* \* \* \*

"In my opinion, this man's heart muscle had been dying for a long time and had been replaced by scar tissue over a period of years—possibly a few years—and that he had a coronary thrombosis or blood clot superimposed on his narrow vessel, possibly a few years before he died, and that this work he was doing required more oxygen to his heart, which didn't get there because the vessels were plugged off and as a result of that the man finally died."

This witness estimated the blood clot formed in the course of three or four hours.

Dr. Roscoe C. Ward, a general practitioner, also testified for the claimant. In regard to the heart attack in relation to the decedent's work, he said:

"He was doing more than his heart would normally permit and any time he exceeded that limit then he in-

creased the danger of producing further damage to the heart, which could take many forms, which in this case, in my opinion, took the form of further mechanical obstruction at that pinpoint and resulted in the further damage and the immediate death."

Dr. John McCarter, a pathologist and witness for the defendant, gave his opinion based on the hypothetical question, the autopsy report, and the cause of death listed in the death certificate. He said:

"In my opinion the occupation and work which Mr. Sutton was doing at the time of his death had no cause and effect relationship with his death.

\*　　\*　　\*　　\*　　\*　　\*

"The lesions which are detailed in the autopsy report and which have been discussed here are of long standing and chronic progression. The cause of death in the muscle, when it occurred, was due to lesions which had been accumulating over a long period of time. His death at the mill was, in my opinion, coincidental and not causative in any manner."

Another expert witness for the defendant, Dr. C. C. Johnson, is a specialist in internal medicine. He, too, gave as his opinion:

"\*　\*　\* his activity had nothing to do with his death."

Dr. Johnson said the strain of lifting a 16-pound or 18-pound board "is certainly not any greater than just walking and probably not as great." The witness said he had lifted a 15-pound board to see how heavy it was and could not "see that is any harder than walking at a normal rate."

This testimony of Dr. Johnson assumed a state of facts different from that presented by the case. He compared the effort required in walking and the effort expended in lifting a single board. The evidence showed Sutton lifted approximately four boards per minute, on the average, and he might handle from one board per minute to one every four or five seconds, depending upon the speed at which the boards came from the planer.

The Board, as a basis for granting the award, made the following finding:

"There was nothing unusual or untoward in the work itself or in the working conditions. The only unusual circumstance was an impaired heart suffering from an unrecognized disease. What happened was inevitable in view of the severity of the pre-existing infirmity and unavoidable because of ignorance of its existence.

"As a matter of law in this jurisdiction, ever since in Lewis v. Department of Law Enforcement, (1957) 79 Idaho 40, 311 P.2d 976, the Supreme Court reversed its former decision in

Dunn v. Morrison-Knudsen Company, (1953) 74 Idaho 210, 260 P.2d 398, a heart attack suffered by a workman on the job even when unaccompanied by any unusual exertion or physical or emotional strain connected with the job, is an accident arising out of employment."

This is not the effect of the Lewis case. Our Workmen's Compensation Law is not a life insurance measure. Wade v. Pacific Coast Elev. Co., 64 Idaho 176, 129 P. 2d 894; In re Carrie, 73 Idaho 503, 254 P.2d 410.

█ In regard to the finding of an accident, this Court, in Dyre v. Kloepfer and Cahoon, 64 Idaho 612, 134 P.2d 610, said it is the duty of the Board, and not the Court, to make findings of fact and rulings of law. On appeal from orders of the Industrial Accident Board, this Court can review only questions of law; it can neither weigh the evidence nor make findings of fact.

█ The order of the Board is reversed, and the cause is remanded for the Industrial Accident Board to make a specific finding of fact as to whether the decedent received a personal injury caused by an accident arising out of and in the course of employment within the meaning of I.C. § 72–201. Based upon that conclusion, the Board will then make an appropriate order.

No costs allowed.

TAYLOR, C. J., KNUDSON and McFADDEN, JJ., and MARTIN, D. J., concur.

SMITH, J., not participating.