373 P.2d 332

In the Matter of the Death of
Henry BROWN.

Mary BROWN, Surviving widow, on her own behalf and on behalf of minor dependent children, Claimant-Appellant,

v.

Boyd STEVENS, Employer, and Employers Mutual Liability Insurance Company of Wisconsin, Surety, Defendants-Respondents.

No. 9062.

Supreme Court of Idaho.

July 13, 1962.

Bandelin & Cogswell, Sandpoint, for appellant.

Paul S. Boyd, Boise, for respondents.

SMITH, Chief Justice.

This proceeding arose out of a claim for death benefits by claimant widow on behalf of herself and children on account of the

death of her husband Henry Brown, June 21, 1960, from a heart attack in the course of his employment by defendant employer. Claimant additionally contended that her husband died as the result of personal injury arising out of his employment. The Industrial Accident Board resolved that issue against claimant followed by its order denying compensation. Claimant perfected an appeal from the order.

The crucial issue, raised by claimant's specifications of error, is whether Brown's physical efforts in the performance of his work during the day of his death had a contributory causal relation in precipitating his death under such circumstances as to constitute an accident within the purview of the workmen's compensation law. Claimant's specifications of error require a review of the evidence to ascertain whether it is sufficient to sustain the Board's order.

Brown was a sawyer who used a chain saw, in the lumber industry. He felled trees and bucked them into logs. His work as a sawyer was seasonable, some seven to nine months each year. From the time he commenced working for respondent employer August 1, 1957, until his death June 21, 1960, at the age of 48 years, he missed only five days of his regular employment. During all of his employment by respondent employer he worked in the same general area, Hunt Creek drainage, in Bonner County, in rough terrain, of considerably higher elevation than Priest River, of 2200 feet, where he lived. In 1960 he worked for respondent employer February 1st to 18th, inclusive, and from May 17th to June 21st, inclusive, and produced 985 logs.

Brown worked with a crew of five men consisting of two sawyers and three men operating a jammer. The sawyers felled the trees, cut off the limbs, and sawed the felled timber into 32-foot logs, after which the jammer men skidded and decked the logs.

The sawyer, in determining in what direction a tree should fall, makes an undercut on the side opposite the sawing operation; if the tree tends to fall in a different direction than desired, he drives wedges into the cut. The sawyer saws or chops the limbs from the fallen tree, and saws it into the proper log lengths.

The chain saw which Brown used weighed 30 to 40 pounds with its cutting bar. He usually carried a 4-pound single-bitted axe, which he also used as a mall in driving the wedges. He carried two wedges, and a can of gasoline for refueling the saw's engine about every hour. Brown had to handle the saw at all angles; during working hours he carried and lifted it all the time; he carried it over brush and windfalls, as well as climbed and walked with it. Under U. S. Forest Service regulations

the trees had to be cut approximately 14 inches above the ground. The sawyer would bend, stoop, and kneel in operating the chain saw. A sawyer's work is classified as heavy, "one of the toughest jobs in the woods."

On his last day, June 21st, the area in which Brown worked was about 5200 feet elevation, 38 miles from Priest River. He arrived at the logging site and commenced working about 7:00 o'clock a. m., the usual time. He performed the same type of usual and regular work which he was hired to do; there was nothing unusual or different in connection with his work from his previous performances. He felled approximately 24 trees, averaging 120 feet in height, and produced 70 32-foot logs that day. The last tree which he cut was a cull, not merchantable, but the sawyers, on the basis they worked, cleared the area of non-merchantable as well as merchantable timber.

Brown took the usual half-hour off for lunch. At lunch time he made no complaint about not feeling well. During the forepart of the afternoon a fellow sawyer, working about 200 yards distant in a parallel direction, saw Brown about 2:25 p. m. He saw Brown's last tree fall about 2:40 p. m. Shortly thereafter the men gathered at a near-by road at quitting time. When Brown did not show up three fellow employees, on going to the area where he worked, found him dead, slumped over his saw, which had been turned off.

Assigned cause of death was massive coronary occlusion. No autopsy was performed.

Brown had a previous history of heart disease. Of significance, he suffered a coronary occlusion and myocardial infarction during April of 1956, for which he consulted a physician. Thereafter he was ambulatory under doctor's treatment until August 26, 1956. Treatment consisted of bed rest and coronary dilators. His then attending physician made a diagnosis of "coronary occlusion with angina pectoris." A consultant cardiac specialist diagnosed the condition as "epicardial myocardial infarction." He continued off work until October 1, 1956.

Brown visited his physician about his heart condition suffered in April, 1956, at intervals approximately a week apart, after May 21, 1956, when he was examined by a cardiac specialist. Thereafter his attending physician saw Brown in June, twice in July, and again in October, 1956, for the same illness. Thereafter Brown visited a doctor for the same condition during May and July of 1957, and January and February of 1960. During February of 1960 the doctor continued the coronary dilators.

**436**

The cardiac specialist in June of 1956 reported that Brown was suffering from myocardial damage; although he felt Brown could return to fairly firm work in the future, he expressed the opinion of danger of further involvement of the coronary, particularly "with a more extensive thrombosis and a much more serious myocardial insult."

Brown's physician explained angina pectoris which afflicted Brown, as a symptom, "heart pain that you get when the blood supply to a part is diminished but not completely occluded." The doctor attributed Brown's arteriosclerosis or atherosclerosis, as a condition of long standing, and more prevalent in men of Brown's age. The attending physician testified:

"A. * * * Obviously he [Brown] had had a coronary occlusion when I saw him and sent him to Dr. Abrams [heart specialist]. The evidence certainly warrants that diagnosis, and yet the man went back to his full time work, doing exactly the same work he had done for years, still with anginal complaints but still able to do the work. This man didn't miss much work * * *.

* * * * * *

"Q. Did he ever complain about his work. His inability to do the work? A. No."

The doctor stated that the condition was troublesome to Brown, because he was under medication. Although he had b running a chain saw for years, he had t pre-existing heart condition and the w did not bring about that condition.

Brown's attending physician felt that t massive coronary occlusion was undoubt ly a correct diagnosis with onset with minutes before death. He agreed that t heart attack would be classified as a sudd type of attack.

The doctor on direct examination state that in his opinion Brown underwent suffi cient exercise to precipitate a heart attack on the day of his death, although over-exertion for one individual is not necessarily overexertion for another. He then qualified such testimony on cross-examination, by stating that it is very difficult to answer that Brown's exercise on the fatal day induced sufficient strain to cause his death. He stated that one can have a coronary occlusion—a heart attack—while sound asleep or sitting in a chair, as well as while at work,—at any time. He admitted that there are many "imponderables" in the case of heart failure; also, since there was no autopsy there had to be suppositions as to the diagnosis, stating, "We didn't have an autopsy. The man had a pre-existing heart disease—it is just like supposing that this is the diagnosis."

While the doctor stated the work would be ample to precipitate a coronary in anyone who is susceptible to one, whether he had done the work for years or not, there might be different situations from day to day, such as, for instance, the man might be tired and exhausted which would render him more susceptible, even though he had been doing the same work day after day. Again on cross-examination he qualified such testimony as follows:

"Q. * * * Doctor, I take it that you feel that this possibly could have happened—that's how you feel about it? A. Yes."

Again, the doctor was asked whether the fact that Brown lived at 2200 feet elevation, and was working at an elevation of 5200 feet when the attack came on, "may precipitate a heart attack in a diseased heart," to which he answered:

"A. It could be a contributing factor. I mean to say * * * no, we couldn't say that, but to say that this might be a contributing factor."

The Board, in its rulings of law, after ruling that claimant failed to prove that death was caused or precipitated by accident out of such employment, then ruled:

"There is no doubt that Brown's death was primarily due to pre-existing disease. The most that can be said in deceased's favor was that deceased's work on the fatal day could possibly have hastened or precipitated his death. The only medical witness called to the stand did not testify to such a conclusion as either a medical certainty or a medical probability."

Thus, while an inference could be drawn from the evidence that physical exertion possibly contributed to or hastened decedent's death, the Industrial Accident Board resolved such conflict as appears in the medical evidence against the theory that the diagnosed heart condition with resultant death constituted a personal injury caused by an accident arising out of decedent's employment.

Hard work in itself is not an accident, Bishop v. Morrison-Knudsen Co., 64 Idaho 806, 137 P.2d 963; nor is death in itself an accident, within the purview of the workmen's compensation law. In re Carrie, 73 Idaho 503, 254 P.2d 410.

The burden of proof was upon claimant to prove that the decedent suffered a personal injury caused by an accident arising out of and in the course of his employment which resulted in his death. I.C. § 72–201; Zimmerman v. Harris Lumber Company, 82 Idaho 187, 350 P.2d 746; Sutton v. Brown's Tie & Lumber Company, 82 Idaho 135, 350 P.2d 345; Darvell v. Wardner Industrial Union, 78 Idaho 309,

302 P.2d 950; Jensen v. Bohemian Brew., Inc., 64 Idaho 679, 135 P.2d 442; Brooke v. Nolan, 59 Idaho 759, 87 P.2d 470. Moreover, there must be a probable, as distinguished from a possible, connection between cause and effect, to constitute an accident arising out of and in the course of employment causative of the alleged personal injury. Darvell v. Wardner Industrial Union, supra; Jensen v. Bohemian Brew., Inc., supra; Neale v. Weaver, 60 Idaho 41, 88 P.2d 522; Brooke v. Nolan, supra; Croy v. McFarland-Brown Lumber Co., 51 Idaho 32, 1 P.2d 189.

We are constrained to the view that the findings of the Industrial Accident Board and its order denying compensation are supported by substantial, competent though somewhat conflicting evidence; therefore, they will not be disturbed. In re Sutton, 83 Idaho 265, 361 P.2d 793; In re Linzy's Death, 79 Idaho 514, 322 P.2d 330; Limprecht v. Bybee, 76 Idaho 293, 281 P.2d 1047; Nitkey v. Bunker Hill & Sullivan Mining & Con. Co., 73 Idaho 294, 251 P.2d 216; Morgan v. Simplot, 66 Idaho 84, 155 P.2d 917; Jensen v. Bohemian Brew., Inc., supra.

The order of the Industrial Accident Board denying compensation is affirmed. No costs allowed.

TAYLOR, KNUDSON, McQUADE and McFADDEN, JJ., concur.