435 P.2d 244

Henrietta Pearl TIPTON, Widow of Herald L. Tipton, Deceased, Claimant-Appellant,

v.

Charles J. JANSSON and Roy Jansson dba Jansson Auto Salvage, and Argonaut Insurance Company, Defendants-Respondents.

No. 9951.

Supreme Court of Idaho.

Dec. 18, 1967.

May & May, Twin Falls, for appellant.

Moffatt, Thomas, Barrett & Blanton, Boise, for respondents.

McQUADE, Justice.

This is an appeal from an Industrial Accident Board order denying a claim for workmen's compensation for the death of appellant's husband.

Death was caused by a rupture of an aneurysm on an artery in the brain. The rupture apparently happened during decedent's working hours.

The Board found appellant did not prove an industrial accident had caused the rupture. To the contrary, the Board determined, the evidence shows "almost a medical certainty and in any event a medical probability" that a "congenital abnormality," weakening of the artery, made the rupture "inevitable irrespective of what the decedent was doing."

Appellant asserts the evidence establishes as a matter of law that decedent's muscular strain on behalf of his employer caused the rupture and subsequent death.

Concluding the record sufficiently supports the Board's order, we affirm.

The pertinent facts are as follows. Appellant's husband, Herald L. Tipton, worked in an auto salvage yard belonging to respondents Charles J. and Roy Jansson. His duties included removal of parts from disabled motor vehicles.

The evidence shows that on December 7, 1964, Tipton was a muscular man (5' 10" in height, weighing 170 pounds), forty-seven years old. His normal work involved much lifting, which the Board characterized as "moderate but at time [sic] heavy, including the lifting by himself of transmissions." His employer testified Tipton had told him he enjoyed lifting and thought it was good for him.

During the evening December 6, and the early morning prior to 8:00 a. m., December 7, witnesses said, Tipton appeared his normal self. December 7, he began work at 8:00 a. m., and within the next one-half hour he removed a radiator, a fan blade and pulley, and a water pump from a disabled 1957 Plymouth station wagon which had stood in the yard for several months.

Tipton worked alone during that period, and no one observed him. Depending on the condition of the parts just mentioned, which the evidence does not disclose, their removal may have required substantial energy. He was next seen sometime between 8:30 and 8:45 a. m., when respondent Charles J. Jansson and a co-worker, Leland Fitzpatrick, saw him walking from the work yard towards the office. The testimony of each leaves no doubt that something unusual had happened to Tipton. Respondent Charles J. Jansson said:

"He was * * * flopping his face * * * his eyes * * * were all bugged out * * * I grabbed his arm and asked what was wrong and all he could do was just mumble.

* * * * * *

"He was just kind of out of his head. * * * I knew he wasn't in his right mind.

* * * * * *

"His eyes were bugged out. He was staring just like kind of straight ahead * * * *."

The co-worker said:

"He was a hollering and slapping his hands and slapping his head and carrying on."

The co-worker immediately started his car and he and respondent Jansson drove Tipton to the hospital. During the trip, the co-worker testified:

Tipton "was clawing his head and carrying on. * * * He was just like a wild man. He was slapping at his head all the time, just like something was killing him or something. * * * He just kept a fighting at his head and at the top of the car."

The co-worker stated his opinion that "something had happened" to Tipton's "appearance or his personality while he was in that yard." He said "what it was, I don't know," and added he never before had seen decedent act that way.

Doctor V. Ellis Knight, a general practitioner in Twin Falls, examined Tipton in the hospital's emergency room at about 9:00 a. m., December 7, 1964. He found him suffering from a generalized severe headache, but observed no external signs of injury on Tipton's skull. By noon that day, Tipton's condition had worsened, Dr. Knight said, and at about 5:00 p. m. he was semi-comatose. Next morning, a spinal tap by Dr. Knight disclosed gross blood in the spinal fluid. Diagnosing intracerebral hemorrhage, Dr. Knight referred Tipton to Dr. Stewart A. Wright, a neurosurgeon in Salt Lake City.

Sometime on December 8, Tipton was taken to a hospital in Salt Lake City for treatment by Dr. Wright. In a report to the Industrial Accident Board, Dr. Wright described Tipton's injury as follows:

"It was my impression [on first examination] that the patient had suffered an intracranial hemorrhage and a spinal tap corroborated this, the pressure being above 300 mm, and the fluid being very bloody.

"A neurologic work-up was carried out and by cerebral angiography a 'fairly large aneurysm on the left middle cerebral artery' was found. * * * [Surgery] (a craniotomy) [was performed] on 12–18–64. The indicated aneurysm was

found, and was removed * * *. At surgery I found that there had been great destruction of brain tissue caused by rupture of the aneurysm and bleeding into the brain tissue. The patient stood the surgery well, but it was felt that the outlook for his life was not good because of the great destruction of brain tissue which had occurred."

Tipton died December 19, the morning after his craniotomy.

What exactly Tipton was doing when the aneurysm ruptured is of course not disclosed by the foregoing statement of facts. The Board found no evidence showing whether he actually was working at the moment of rupture.

Appellant quotes part of Dr. V. Ellis Knight's testimony and contends it is at odds with this finding. Taken as a whole, however, Dr. Knight's testimony does not support appellant's contention.

In direct testimony for appellant's case, Dr. Knight recalled Tipton as having told him: "while he was lifting, I believe he said, on a motor or something from a car in the yard and he had a sudden onset of pain in his head." On cross-examination, however, Dr. Knight contradicted his earlier testimony, saying he could not remember the identity of his informant, whether Tipton, his co-worker or respondent Charles J. Jansson.

Dr. Knight refuted his earlier statement that he had discussed that matter with Tipton when he first saw him at 9:00 a. m. on December 7:

"When I first saw him in the emergency room he was fairly clear. However he was in quite a bit of pain and complained bitterly of pain and for that reason I didn't question him."

Finally, the doctor said his informant "must have been the man that came in with him." As the Board noted, neither of Tipton's

companions knew the immediate circumstances of the aneurysm's rupture.

At the Board hearing, appellant stressed Tipton's head had been bare when he first was seen walking out of the work yard, though it was his custom to work with a cap on. His cap (and gloves) were found on the ground near the vehicle from which he had been removing parts. Appellant argues this indicates some external force suddenly had struck Tipton.

The Board in its findings noted appellant's argument, but responded: "Considering decedent's erratic movements when first observed by witnesses Fitzpatrick [the co-worker] and Jansson [a respondent], counter inferences can be drawn from the same facts." This resolution of conflicting inferences was within the Board's province as trier of facts.[1]

The Board correctly found the record contains no evidence of Tipton's precise activity at the moment the aneurysm ruptured.

Concerning the physiological aspects of Tipton's injury and death, medical experts presenting evidence agreed the probable cause of death was rupture of the aneurysm on decedent's left middle cerebral artery. There was some disagreement, however, with respect to probable cause of the rupture itself.

Respondents presented testimony of three doctors: Paul F. Miner, certified by the American boards of internal medicine and of cardiovascular disease; Edward J. Kiefer, neurosurgeon; and Quentin W. Mack, general surgeon. Each practices in Boise; none treated decedent. These doctors studied the medical reports in evidence and responded to hypothetical questions. Appellant did not object to the final contents of the hypotheticals.

Dr. Miner, cardiology specialist for ten years preceding the hearing, said "My

1. Idaho Const., art. 5, § 9; I.C. § 72–609 (a & d); Bennett v. Bunker Hill Co., 88 Idaho, 300, 399 P.2d 270 (1965); cf.

Dawson v. Hartwick, 91 Idaho 561, 428 P.2d 480 (1967).

opinion is that this man's work was not the cause of his illness and death."

Dr. Kiefer testified:

"A It was my opinion after going over the records that the incident that did occur to him was actually in no way aggravated by his work; that this was an inevitable thing that could have happened at home * * *."

Dr. Mack said:

"A In my opinion this is not an accident. This is the end result of a disease process. * * * [Decedent's aneurysm was] a congenital thing that [was] not related to injury or occupation or what the man may have been doing at the time the aneurysm ruptured."

On appellant's behalf, two doctors testified: V. Ellis Knight, in general practice at Twin Falls, who examined decedent shortly after his injury and knew him from previous treatment; and Stewart A. Wright, a Salt Lake City, Utah, neurosurgeon, since 1949 an accredited member of the American Board of Neurological Surgery, who treated decedent from December 8, 1964, until decedent's death, December 19th.

Dr. Knight said he could not make a definite statement concerning the cause of rupture of decedent's aneurysm.

Testifying by deposition, Dr. Wright said:

"increase in his [decedent's] blood pressure incident to the work he was doing at the time, in my opinion, is the most probable cause of the rupture of the aneurysm."

His opinion, however, was founded on a belief that decedent had in fact been at work, lifting and straining at the precise moment of rupture.

Dr. Wright said:
"an aneurysm can rupture for example while a person is asleep or while they are sitting quietly reading. This is possible but I don't see the relationship to this case because this man was not sitting quietly reading a book or quietly asleep when he got into distress. Insofar as I am aware, and *it seems to be a matter of proven fact, the man was at work when this occurred."* (Emphasis supplied).

The Board discounted Dr. Wright's opinion testimony. Such determination was within the Board's province as trier of facts.[2]

 Workmen's compensation for personal injury or death will be granted only if it be shown that an industrial accident has caused the affliction.[3] Appellant had the burden of proving both elements, the accident and its causation of the injury.[4]

2. See, e.g., Dawson v. Hartwick, supra n. 1; Bradshaw v. Bench Sewer District, 90 Idaho 557, 414 P.2d 661 (1966); cf. authority cited n. 1, supra. That the medical experts for appellant personally treated decedent, but those for respondent testified from accurate hypothetical questions, does not interfere with the Board's fact-finding discretion. Bradshaw v. Bench Sewer District, supra.

3. "72–201. *Right to compensation for injury.*—If a workman receives personal injury caused by an accident arising out of and in the course of any employment covered by the Workmen's Compensation Law his employer or the surety shall pay compensation in the amounts and to the person or persons hereinafter specified.

" 'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law.

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. * * *"

4. E.g., In re Brown's Death, 84 Idaho 432, 373 P.2d 332 (1962); Darvell v. Wardner Industrial Union, 78 Idaho 309, 302 P.2d 950 (1956).

Merely showing an aneurysm ruptured while an employee was at his normal place of work does not conclusively prove either element.[5] Lewis v. Department of Law Enforcement, 79 Idaho 40, 311 P.2d 976 (1957) is not contra. Nor does Hammond v. Kootenai County, 91 Idaho 208, 419 P.2d 209 (1966) support a contrary proposition. In the *Hammond* case, this Court merely affirmed the findings of the Board.

In the present proceeding, the evidence sufficiently supports the Board's order denying appellant's claim.

Judgment affirmed.

TAYLOR, C. J., and SMITH, McFADDEN and SPEAR, JJ., concur.

5. Cf. Sutton v. Brown's Tie and Lumber Co., 82 Idaho 135, 350 P.2d 345 (1960); Bradshaw v. Bench Sewer District, supra n. 2; In re Brown's Death, supra n. 4; Zimmerman v. Harris Lumber Co., 82 Idaho 187, 350 P.2d 746 (1960).